Frank **MUSSEMANN, M.D., Amy Plummer, M.D., and Daniel Hersh, M.D.,** Appellants,

v.

Mercedes **VILLARREAL,** as next friend of **Juan Pablo Elizondo,** a minor, Appellee.

No. 14–04–00746–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 25, 2005.

Rehearing En Banc Overruled Nov. 17, 2005.

Claude M. McQuarrie, III, Warren Szutse Huang, Houston, for appellants.

Candelario Elizondo, Houston, Les Weisbrod, William Arthur Newman, Dallas, for appellee.

Panel consists of Justices ANDERSON, FROST, and SEYMORE.

## OPINION

KEM THOMPSON FROST, Justice.

Appellants Frank Mussemann, M.D., Amy Plummer, M.D., and Daniel Hersh, M.D. appeal from the trial court's denial of their motion for summary judgment. After reviewing the record, we conclude that they have failed to conclusively establish the affirmative defense of official immunity as a matter of law, and we therefore affirm the trial court's denial of their motion for summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellants Frank Mussemann, M.D., Amy Plummer, M.D., and Daniel Hersh, M.D. (hereinafter collectively referred to as the "Doctors") were third-year and fourth-year residents at Baylor College of Medicine, working rotations at Ben Taub General Hospital ("Ben Taub"), when Mercedes Villarreal presented with complications late in pregnancy. The Doctors assisted Villarreal with the management of these complications and with the eventual caesarean birth of Villarreal's son. Villarreal's son was born in distress and suffers from severe birth defects. Appellee Mercedes Villarreal, as next friend of her son Juan Pablo Elizondo, has sued the Doctors, alleging that they negligently performed their duties. Although the Doctors dispute that they were negligent, they moved for summary judgment based on the affirmative defense of official immunity. The trial court denied the Doctors' motion, and the Doctors have filed this interlocutory appeal, arguing that the summary-judgment evidence conclusively es-

tablishes their entitlement to official immunity as a matter of law.[1]

## A. Villarreal's Experience at Ben Taub

Villarreal is from Mexico. She came to the United States when she was about three months pregnant and began receiving prenatal care from the Southwest Community Clinic, a public facility operated by the City of Houston. Thereafter, she intermittently saw doctors at Ben Taub's obstetric clinic, beginning in December 1994. When Villarreal was diagnosed as a high risk patient near the end of her pregnancy, she was referred to Ben Taub's High Risk Obstetric Clinic for continued prenatal care and eventual delivery.

Villarreal suffered from gestational diabetes. In addition, her baby was in a breech position. When the medical providers at Ben Taub began managing her pregnancy, they first tried to correct the baby's breech presentation by a procedure called a "version," which is an external manipulation of fetal position. This procedure was not successful, so it became necessary to consider delivery by caesarean section. Given the probable caesarean section, and the fact that gestational diabetes can compromise fetal lung maturity, Villarreal was advised to undergo a third-trimester amniocentesis to make sure the baby's lungs had matured sufficiently.

On April 20, 1995, Dr. Plummer performed the amniocentesis on Villarreal. Afterwards, Dr. Plummer monitored the baby for five to ten minutes on ultrasound equipment. At this time, Dr. Plummer did not monitor the baby using an electronic fetal monitor.

Three days after the amniocentesis, Villarreal came to Ben Taub complaining that she had not felt her baby moving that day. A nurse placed her on an electronic fetal monitor, which showed that the fetal heart rate was minimally reactive and needed investigation. A first-year resident supervised by Dr. Hersh evaluated Villarreal and began a biophysical profile ("BPP") of the baby. When the resident saw no evidence of fetal movement, he contacted Dr. Hersh to continue the BPP. Dr. Hersh completed the BPP, which yielded abnormal results and showed that the baby had been motionless for the entire examination. According to Dr. Hersh, these facts required an "urgent" caesarean section. Dr. Hersh consulted with his supervising resident, Dr. Mussemann, regarding this proposed course of treatment, and Dr. Mussemann concurred.

During preparations for the caesarean section, Villarreal had a contraction, and the fetal heart rate further declined. With this development, Dr. Mussemann determined that a "stat" or "emergency" caesarean section should be performed immediately. Villarreal's baby was soon delivered by caesarean section. He was limp and pale, and tests revealed that he had severe anemia due to a massive fetal-maternal hemorrhage, that is, a loss of the baby's blood into the mother's system. After treatment in the neonatal unit, the baby eventually was discharged. After the baby's discharge, medical providers determined that, among other things, he suffered from severe global developmental delay and mental retardation.

## B. Villarreal's Lawsuit on Behalf of Her Son

Villarreal, as next friend of her son, filed a medical-malpractice suit against the Doctors. In this suit, Villarreal asserts the

---

1. We have jurisdiction over this interlocutory appeal under section 51.014(a)(5) of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE § 51.014(a)(5) (Vernon Supp.2005).

Doctors were negligent based on the following alleged acts and omissions:

- Dr. Plummer's performance of an amniocentesis that was unnecessary and conducted improperly;
- Dr. Plummer's failure to monitor the fetus after the amniocentesis with an electronic fetal monitor, so that any adverse effect could be identified and addressed;
- Dr. Hersh's failure to properly supervise a first-year resident;
- Dr. Hersh's failure to promptly recognize an uncorrectable, non-reactive fetal heart-rate pattern on the fetal-monitor strip;
- Dr. Hersh's failure to consult more promptly with the supervising resident, Dr. Mussemann, or an attending physician, when faced with an uncorrectable, non-reactive fetal heart-rate pattern;
- Dr. Hersh's performance of an unnecessary BPP of the fetus, which delayed the caesarean section;
- Dr. Mussemann's failure to properly supervise Dr. Hersh;
- Dr. Mussemann's failure to perform an "emergency" caesarean section, as opposed to an "urgent" caesarean section, when first consulted by Dr. Hersh;
- Dr. Mussemann's choice of anesthesia for performing the caesarean section; and
- Dr. Mussemann's failure to consult more promptly with the attending physician.

## C. Official Immunity and the Nature of the Practice at Ben Taub

Although the Doctors dispute Villarreal's allegations of negligence, for the purposes of this appeal, they rely on the defense of official immunity. Because Ben Taub is a public hospital operated by the Harris County Hospital District, which provides acute-care medical services to the indigent and low-income population of Harris County, the Doctors contend that they are immune from liability for their actions in treating Villarreal.

To support their position regarding official immunity, the Doctors proffered summary-judgment evidence regarding the nature of the practice at a large public hospital like Ben Taub. The Doctors claim that Ben Taub is chronically strained by budgetary constraints and that it does not have access to state-of-the-art equipment, an adequate nursing staff, or even sufficient space to accommodate its extremely high patient load. The Doctors also note that their practice is characterized by higher-than-average workplace stress due to the combination of a high patient load and inadequate resources. The Doctors allege that treating an indigent or low-income population has its own complications, including frequent language barriers and incomplete or misplaced medical records, with resulting uncertainty regarding a patient's medical history.

The Doctors contend that these and other factors complicate the treatment of the typical obstetric patient. Many obstetric patients have had gaps in prenatal care and testing, and may have an uncertain date for the beginning of pregnancy. Due in part to these problems, many of these patients either are or have become high risk and present more complicated medical issues than do patients at private hospitals. In addition, longer-than-average delays sometimes complicate prenatal testing and procedures. The Doctors claim that these and other factors impacted their treatment of Villarreal.

Notwithstanding these difficulties, Ben Taub's physicians are required to treat all

patients who present themselves for treatment, as long as Ben Taub routinely provides the type of treatment such patients are seeking. Because Ben Taub provides obstetric care for both normal and high risk pregnancies, obstetric patients such as Villarreal, who present themselves to Ben Taub's High Risk Obstetric Clinic, are routinely treated, irrespective of complications they may have or risks of a poor outcome.

The Doctors moved for summary judgment, claiming that these factors conclusively established their right to official immunity. The trial court denied the motion for summary judgment. Appealing this ruling, the Doctors argue that they are entitled to official immunity because they exercised governmental discretion, or medical discretion "colored by governmental factors and concerns," when they treated Villarreal. Alternatively, the Doctors contend that public policy considerations require this court to re-evaluate the doctrine of official immunity as it is applied to medical personnel under *Kassen v. Hatley*, 887 S.W.2d 4 (Tex.1994).

## II. STANDARD OF REVIEW

We review a trial court's denial of summary judgment de novo. *See Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex.2004). Because the doctrine of official immunity is an affirmative defense, to prevail on summary judgment, a movant must establish conclusively each element of this affirmative defense.

*Kassen v. Hatley*, 887 S.W.2d 4, 8 (Tex. 1994). To meet this burden, the Doctors must demonstrate that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *Id.* at 8 n. 2. In determining whether an issue of material fact exists, we take as true all evidence favorable to the nonmovant and indulge all reasonable inferences in the nonmovant's favor. *Id.*

## III. ANALYSIS

### A. Have the Doctors conclusively established that they exercised governmental discretion?

Ordinarily, public officials must show the following elements to establish a defense of official immunity: (1) the performance of a discretionary function, (2) in good faith, and (3) within the scope of the employee's authority.[2] *Kassen*, 887 S.W.2d at 9. In *Kassen*, the Texas Supreme Court adopted the rule of official immunity from other states that requires government-employed medical personnel[3] who seek official immunity to prove that they are being sued for the exercise of "governmental discretion" rather than "medical discretion." *Id.* at 11. The *Kassen* court agreed with cases from other states holding that governmental discretion, which would entitle such medical personnel to immunity, refers to actions taken in an administrative or policy-making capacity. *Id.* at 11 & n. 7 (noting agreement

---

2. We note that the only issue before this court is the Doctors' entitlement to summary judgment based on their defense of common-law official immunity. There are no issues of sovereign immunity or statutory immunity before us.

3. The Texas Health and Safety Code provides that residents of supported medical schools are employees of the State "for the purposes of determining the liability, if any, of the person for the person's acts or omissions while engaged in the coordinated or cooperative activities of the unit, school, or entity." TEX. HEALTH & SAFETY CODE ANN. § 312.007(a) (Vernon 2001). It is not disputed that the Doctors were residents at Baylor College of Medicine when they provided Villarreal treatment or that Baylor College of Medicine was a supported medical school as defined by the Texas Health and Safety Code. *See* TEX. HEALTH & SAFETY CODE ANN. § 312.002(6).

with *Henderson* and *Comley* cases); *Henderson v. Bluemink,* 511 F.2d 399, 403 & n. 24 (D.C.Cir.1974) (stating that governmental discretion, to which official immunity applies, includes acts performed in an administrative capacity); *Comley v. Emanuel Lutheran Charity Bd.,* 35 Or. App. 465, 478–79, 582 P.2d 443, 451–52 (1978) (holding doctor did not have immunity in suit alleging he committed various acts of medical negligence in treating a patient and stating that doctor's alleged acts were not the exercise of governmental discretion because they did not involve decisions regarding public policy). The *Kassen* court also stated that it agreed with decisions from other states holding that discretion exercised in the treatment of individual patients is medical discretion not entitled to immunity. *Kassen,* 887 S.W.2d at 11 & n. 7 (noting agreement with *Womble, Cooper,* and *Protic* cases); *Womble v. Singing River Hosp.,* 618 So.2d 1252, 1262–65 (Miss.1993) (stating that government-employed medical personnel have no immunity for their decisions involving individual medical treatment but that they have immunity for decisions regarding the formulation and implementation of public policy), *superseded by statute as stated in Sparks v. Kim,* 701 So.2d 1113, 1115 & n. 2 (Miss.1997); *Cooper v. Bowers,* 706 S.W.2d 542, 543 (Mo.Ct.App.1986) (holding that a government-employed doctor does not perform a governmental function by treating patients); *Protic v. Castle Co.,* 132 Wis.2d 364, 369–70, 392 N.W.2d 119, 122 (Ct.App. 1986) (stating that providing medical care to patients does not involve governmental policy and decision-making that would entitle government-employed doctor to immunity).

To qualify for protection, the discretion exercised need not be "uniquely governmental." *Kassen,* 887 S.W.2d at 12. To determine the character of the discretion medical personnel exercised, we must examine the facts of each case and the underlying policies promoted by official immunity. *Id.* Our decision necessarily involves a balancing of individual rights and the public interest. *Id.* The *Kassen* court declined to provide a precise definition for determining when the acts of government-employed medical personnel involve governmental discretion. *Id.* at 12. n. 8. However, the *Kassen* court recommended that courts consider the following factors:

1. the nature and importance of the function that the employee is performing,

2. the extent to which passing judgment on the exercise of discretion by the employee will amount to passing judgment on the conduct of a coordinate branch of government or an agency thereof,

3. the extent to which the imposition of liability would impair the employee's free exercise of discretion,

4. the extent to which financial responsibility will fall on the employee,

5. the likelihood that harm will result to the public if the employee acts,

6. the nature and seriousness of the type of harm that may be produced, and

7. the availability to the injured party of other remedies and forms of relief.

*Id.* (citing RESTATEMENT (SECOND) OF TORTS § 895D cmt. f (1977)).

In discussing the distinction between governmental discretion and medical discretion, the *Kassen* court indicated that government-employed medical personnel exercise governmental discretion in the following circumstances: (1) when they exercise policy-making or administrative responsibilities not shared by private-sector providers, and (2) when they decide how to

allocate a scarce pool of state resources among possible recipients. *Kassen,* 887 S.W.2d at 10. On the other hand, the *Kassen* court indicated that discretion exercised by government-employed medical personnel in their treatment of patients is medical discretion not subject to immunity. *See id.* at 10–11. The *Kassen* court stated that, if governmental factors and concerns colored the discretion of government-employed medical personnel, policy considerations may call for immunity, even though these personnel have duties and responsibilities that coincide with private-sector providers. *Id.* at 12.

It is undisputed that the Doctors exercised discretion; the issue on appeal is whether the trial court erred in determining that the Doctors did not conclusively establish each element of their official-immunity defense. More specifically, we must determine whether the trial court erred in ruling that the Doctors did not conclusively establish that Villarreal is suing them for exercising their governmental discretion.

Villarreal alleges negligence based on the need for a third-trimester amniocentesis, the performance of the amniocentesis itself, and the need for monitoring afterwards. All of these acts or omissions relate to a doctor's specialized knowledge, judgment, and discretion in treating a specific patient. The same is true for the decisions involving Villarreal's labor and delivery. What sort of tests to perform and the interpretation of the test results each required a physician to assess the situation and decide the appropriate course of action. What sort of anesthesia to use during a caesarean section and whether to perform the procedure on an "urgent" or an "emergency" basis are exercises of medical discretion. Finally, supervising the medical decision-making of less-experienced doctors, along with deter-

mining when to consult more-experienced physicians, are the exercise of medical discretion. *See, e.g., Drogin v. Campbell,* 928 S.W.2d 205, 207 (Tex.App.-San Antonio 1996, no writ) (holding that a decision based on medical necessity involved the exercise of medical discretion). Under the legal standard set forth in *Kassen,* we conclude that Villarreal is suing the Doctors based on their exercise of medical discretion rather than governmental discretion. *See id.* (holding that employees of state hospital did not have official immunity for their alleged negligence in treating and releasing patient because they exercised medical discretion under *Kassen*); *Womble,* 618 So.2d at 1262–65 (holding that emergency-room doctors were not immune from malpractice action against them because their treatment of the patient in question did not involve formulating or implementing government policy); *Cooper,* 706 S.W.2d at 542–43 (holding that a prison doctor did not have immunity for discontinuing an inmate's medication because the doctor was treating a patient, which is not "conduct partaking of the essence of governing") (quotations omitted); *Comley,* 35 Or.App. 465, 478–79, 582 P.2d 443, 450–52 (holding doctor was not immune because his alleged negligence in treating premature child did not involve governmental discretion); *Protic,* 392 N.W.2d at 122 (holding that doctor was not entitled to immunity because his alleged negligence in treating patient did not involve governmental decisionmaking).

The Doctors argue that they exercised "governmental discretion" in treating Villarreal because they provided health care to the indigent, caring for government patients with government resources in a government facility. These factors do not show that the Doctors exercised governmental discretion under the *Kassen* legal standard. The *Kassen* court indicated that discretion exercised by government-

employed medical personnel in their treatment of patients is medical discretion not subject to immunity. *Kassen*, 887 S.W.2d at 10–11. The facts of *Kassen* involved a challenge to the decision-making of a third-year resident serving at a public hospital. *Id.* at 7. The *Kassen* court concluded that, because the challenged decision was motivated by "therapeutic considerations," the "exercise of discretion was medical only," and the resident, though working at a public hospital, was "not entitled to official immunity." *Id.* at 12. Concluding that government doctors are entitled to immunity simply because they practice medicine in the setting of a government hospital, under more adverse conditions than private doctors, would be contrary to *Kassen* and the cases cited therein. *See id.* at 9–12.

In addition, the Doctors have developed a record of what they contend are "governmental factors and concerns" that allegedly "colored" the exercise of their discretion. They contend that these factors were not present in *Kassen* and that the presence of these factors and concerns affected their medical discretion in a manner that requires us to grant them immunity. We do not find the Doctors' arguments persuasive.

The Doctors introduced evidence regarding what sort of patient Villarreal was, claiming that the following facts were governmental factors or concerns that colored their discretion:

- Villarreal had gaps in prenatal care and limited availability of records.

- Villarreal's prenatal care was provided by different providers at different locations.

- Villarreal's limited ability to speak English may have created a language barrier.

- The Doctors viewed Villarreal as a "non-compliant" patient who had a high risk for a poor outcome.

Although these issues may have influenced how the Doctors treated Villarreal, none of the factors is governmental in nature. Instead, any patient—even a private patient—may present for treatment with factors like these, ultimately requiring a private physician to make treatment decisions under less-than-perfect circumstances. *Cf. Borrego v. City of El Paso*, 964 S.W.2d 954, 959 (Tex.App.-El Paso 1998, pet. denied) (stating that decision to immobilize critical patient prior to moving him from scene of accident was medical in nature and thus not entitled to immunity). Even if these factors occur with more frequency in an indigent or low-income population, this does not convert the Doctors' exercise of medical discretion into governmental discretion.

The Doctors also introduced evidence about the nature of public hospitals, noting that Ben Taub, like similar institutions, suffers from budgetary constraints, limited equipment and testing, the necessity of using residents to perform services, and the mandate to accept all patients who present for treatment. These problems, however, are the sort that are likely to be present in most or all public hospitals. To hold that these factors conclusively establish a right to official immunity would eviscerate the *Kassen* legal standard. Indeed, as discussed, some of these problems were either present or noted in *Kassen* itself. *See, e.g., Kassen*, 887 S.W.2d at 10 (stating that "government health care providers have less latitude in choosing patients than their private-sector counterparts"); *see also Gross v. Innes*, 930 S.W.2d 237, 241 (Tex.App.-Dallas 1996) (stating that "the fact that [medical personnel] did not have the option to refuse treating [a patient] is not a governmental factor coloring medical

discretion in this case"), *writ dismd w.o.j.*, 988 S.W.2d 727 (Tex.1998).

The Doctors argue that their care decisions were influenced by the fact that resources, such as electronic fetal monitors, were limited, and that some lab work, like analysis of the amniocentesis, had to be outsourced. These facts still fail to establish that the Doctors exercised governmental discretion. *See, e.g., Gross,* 930 S.W.2d at 241 (stating that "deciding what equipment to use in treating [patient] was an exercise of medical discretion"). The *Kassen* court indicated that "the need to allocate scarce state hospital resources among potential patients" is a "governmental concern." 887 S.W.2d at 12. In this case, however, there is no summary-judgment evidence that the Doctors were involved in the allocation of hospital resources among patients or in the exercise of any other administrative or policy-making discretion at Ben Taub.[4]

The Doctors also rely on a series of cases granting immunity to other public servants, such as a paramedic, a pathologist, a constable, and a mortician, to argue that doctors serving the public are entitled to immunity.[5] The facts in these cases, however, are distinguishable from the present situation. Each case involved decision-making that implicated some aspect of public safety at large, such as traffic safety or accident investigation or management. The Doctors' actions in this case, by contrast, do not directly relate to the safety of the public at large. They instead relate to the health of a single individual and her unborn child, a circumstance that the court in *Kassen* determined does not necessarily implicate the public interest. *See Kassen,* 887 S.W.2d at 11 (stating "the exercise of medical discretion does not require the same protection as the exercise of governmental discretion"); *see also Gross v. Innes,* 988 S.W.2d 727, 730 (Tex. 1998) (holding that paramedic's emergency transportation was distinguishable from exercise of medical discretion and thus did not give rise to conflict jurisdiction).

Under the *Kassen* standard and for the reasons stated above, we conclude the summary-judgment evidence does not conclusively prove that Villarreal is suing the Doctors based on their exercise of governmental discretion. Therefore, the Doctors did not conclusively establish each element of the affirmative defense of official immunity. Accordingly, we overrule the Doctor's first issue.

**B. Is there a separate inquiry into whether governmental factors and concerns colored the Doctors' exercise of medical discretion?**

■ The Doctors argue that the conclusion that they exercised medical discretion

---

4. Appellant Plummer argues that an electronic fetal monitor was not available to her in the High Risk Obstetric Clinic. However, in her affidavit, appellant Plummer also notes that she could have transferred Villarreal to the Labor and Delivery Unit for further monitoring had complications from the amniocentesis been apparent on the ultrasound.

5. *See, e.g. DeWitt v. Harris County,* 904 S.W.2d 650, 651–54 (Tex.1995) (recognizing that off-duty constable had official immunity arising from clearing and investigating a traffic accident); *Rivas v. City of Houston,* 17 S.W.3d 23, 26–29 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (holding paramedic was entitled to immunity in suit regarding emergency transport of patient in ambulance); *Guerrero v. Tarrant County Mortician Servs. Co.,* 977 S.W.2d 829, 832–34 (Tex.App.-Fort Worth 1998, pet. denied) (holding mortician company who contracted with county medical examiner to remove remains from scene of accident entitled to immunity); *Putthoff v. Ancrum,* 934 S.W.2d 164, 169–70 (Tex.App.-Fort Worth 1996, writ denied) (holding pathologist investigating unexplained cause of death entitled to immunity).

does not end the inquiry under *Kassen.* The Doctors claim they still may be entitled to immunity if they can show that their medical discretion was "colored by governmental factors and concerns." They base this assertion on the following language from *Kassen:*

> We anticipate difficult cases in which government-employed medical personnel will have duties and responsibilities that coincide with private-sector providers. In such cases, if governmental factors and concerns colored the doctor's or nurse's discretion, policy considerations may still call for official immunity. Such decisions necessarily involve a balancing of individual rights and the public interest.

*Kassen,* 887 S.W.2d at 12.

The Doctors assert that this language from *Kassen* requires a separate inquiry into whether the Doctors' exercise of discretion, even if it was medical discretion, was colored by governmental factors and concerns. We disagree with this reading of *Kassen.* Just before the above-quoted language, the *Kassen* opinion states, "[w]e hold that government-employed medical personnel are not immune from tort liability if the character of the discretion they exercise is medical and not governmental." *Id.* at 11. An independent inquiry into whether governmental factors and concerns colored the Doctors' medical discretion would contradict this holding. Furthermore, the *Kassen* court cites cases from other states that determine whether immunity applies based on whether the discretion in question is medical or governmental. Just after the cited language upon which the Doctors rely to support an independent inquiry, the *Kassen* court, in a footnote, lists the factors that courts

should consider in determining whether the discretion at issue is governmental discretion. *See id.* at 12 & n. 8.

In this context, we conclude that the language upon which the Doctors rely does not prescribe a second inquiry into whether governmental factors and concerns colored their medical discretion. Rather, this language describes the determination of whether the discretion at issue was medical or governmental and states that, if governmental factors and concerns colored this discretion, policy considerations may call for a determination that the discretion was governmental, even though the personnel in question have duties and responsibilities that coincide with private-sector providers. *See id.* The summary-judgment evidence does not show that Villarreal is suing the Doctors based on their exercise of any administrative or policy-making discretion at Ben Taub. Nor does the summary-judgment evidence show, let alone conclusively prove, that the Doctors' alleged acts and omissions were an exercise of discretion colored by governmental factors and concerns. Based on the *Kassen* legal standard, we have determined that the discretion at issue is medical and not governmental. The *Kassen* precedent does not require a second inquiry, as urged by the Doctors.[6]

Our construction of the *Kassen* legal standard is supported by the fact that the *Kassen* court did not conduct a separate inquiry into whether governmental factors and concerns colored the medical discretion of the doctor in question. *See id.* Further, most courts that have applied the *Kassen* legal standard have not conducted such a separate inquiry. *See, e.g., City of El Paso v. Higginbotham,* 993 S.W.2d 819, 824 (Tex.App.-El Paso 1999, no pet.) (ask-

---

**6.** Even if *Kassen* did require such a second inquiry, the summary-judgment evidence does not show, much less conclusively prove, that

Villarreal is suing the Doctors based on their exercise of medical discretion that was colored by governmental factors and concerns.

ing only whether paramedic's challenged action was governmental or related "to the proper course of medical treatment"); *Borrego,* 964 S.W.2d at 959 (determining only that "EMS utilized its medical discretion"); *Drogin,* 928 S.W.2d at 207 (determining only that appellants "exercised their medical discretion" in providing treatment); *Carrola v. Guillen,* 935 S.W.2d 949, 953 (Tex.App.-San Antonio 1996, no writ) (stating "the summary judgment evidence does not show that governmental discretion played a role in the decisions that form the basis of this lawsuit"); *but see Gross,* 930 S.W.2d at 241–42 (treating *Kassen* as articulating two alternatives for showing entitlement to official immunity).

We conclude that, under *Kassen,* there is no independent inquiry into whether governmental factors and concerns colored the Doctors' medical discretion. The issue of whether governmental factors and concerns colored the Doctors' discretion is part of the determination as to whether Villarreal is suing the Doctors based on their exercise of governmental discretion.

## C. Do public policy concerns necessitate re-evaluation of the standard set forth by the Texas Supreme Court in *Kassen v. Hatley* ?

In their second issue, the Doctors urge this court to re-evaluate the rule in *Kassen.* The Doctors claim that applying *Kassen* to government doctors is not fair and fails to take account of various public policy concerns that support shielding public doctors from liability. Particularly, the Doctors point to the cost of liability insurance and note that the threat of liability will discourage able physicians and residents from serving in public hospitals.

The Doctors further claim that denying government physicians official immunity threatens the viability of the public health care system in Texas.

The Texas Supreme Court already has weighed these concerns and determined that, when balanced with individual patients' rights, an appropriate compromise is to grant immunity to government medical personnel only when they exercise governmental, as opposed to medical, discretion. As an intermediate appellate court, we are not at liberty to re-evaluate the propriety of this rule or to refuse to apply it to the facts of this case. *In re K.M.S.,* 91 S.W.3d 331 (Tex.2002) (courts of appeals are not free to disregard pronouncements from Texas Supreme Court); *Lofton v. Texas Brine Corp.,* 777 S.W.2d 384, 386 (Tex.1989). If the Doctors want to change the legal standard in *Kassen,* they should address these arguments to the Texas Supreme Court. Furthermore, if, as the Doctors contend, the practice of medicine in the public sector is approaching a crisis, then the Doctors also have the ability to seek redress from the Texas Legislature, which already has provided the medical profession some statutory relief.[7] We overrule the Doctors' second issue.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the Doctors did not conclusively establish that their allegedly negligent conduct occurred during the exercise of governmental, as opposed to medical, discretion. Therefore, the Doctors did not conclusively prove each element of the affirmative defense of official immunity. Accordingly, we overrule the Doctors' issues and affirm

---

7. In 2003, Texas Legislature provided some protection to physicians by, among other things, limiting liability in health care liability claims. *See* TEX. CIV. PRAC. & REM. ANN. §§ 74.301–.303 (Vernon 2004).

the trial court's order denying summary judgment.