George SAADE, M.D., Michael Belfort, M.D., Rakesh Mangal, M.D., and Charles Moniak, M.D., Appellants

v.

Mercedes VILLARREAL, as Next Friend of Juan Pablo Elizondo, a Minor, Appellee.

George Saade, M.D., Michael Belfort, M.D., Rakesh Mangal, M.D., Appellants

v.

Mercedes Villarreal, as Next Friend of Juan Pablo Elizondo, a Minor, Appellee.

Nos. 14–07–00736–CV, 14–07–00926–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 26, 2009.

512

David R. Iler, Warren Szutse Huang, Houston, TX, for appellants.

David P. Matthews, Houston, TX, Les Weisbrod, William Arthur Newman, Anjel Kerrigan Avant, Dallas, TX, for appellees.

Panel consists of Chief Justice HEDGES and Justices GUZMAN and BROWN.

## MAJORITY OPINION

ADELE HEDGES, Chief Justice.

We withdraw our opinion of December 23, 2008, issue the following opinion on rehearing, and overrule appellants' motion for rehearing.

These consolidated interlocutory appeals stem from a medical malpractice lawsuit filed by appellee, Mercedes Villarreal, as next friend of Juan Pablo Elizondo, a minor, against appellants, George Saade, Michael Belfort, Rakesh Mangal, and Charles

Moniak. In cause number 14–07–00736–CV, all of the appellants challenge the trial court's order denying their motion to dismiss based on Texas Civil Practice & Remedies Code § 101.106(f), requiring dismissal of a lawsuit against a governmental employee under certain circumstances. In cause number 14–07–00926–CV, appellants Saade, Belfort, and Mangal challenge the trial court's order denying their motion for summary judgment based on common law official immunity. We affirm both orders.

## I. Background

In late 1994, near the end of her pregnancy, Mercedes Villarreal was referred to the High Risk Obstetric Clinic at Ben Taub General Hospital. The Harris County Hospital District owns and operates Ben Taub, and the hospital is staffed largely by faculty and students from Baylor College of Medicine. On April 12, 1995, Villarreal presented at the clinic complaining of no fetal movement. Upon examination, the fetus was found to be in a breech position. After external manipulation failed to remedy the problem and Villarreal declined a trial of labor, delivery by caesarean section became the most promising option. Based on this determination and a diagnosis of gestational diabetes, which can compromise fetal lung maturity, Villarreal was advised to undergo a third-trimester amniocentesis to make sure the baby's lungs had matured sufficiently. After attending physicians Dr. Michael Belfort and Dr. George Saade approved the procedure, Dr. Amy Plummer, a third-year resident, performed the amniocentesis on April 20, 1995. Plummer then monitored the baby for five to ten minutes using ultrasound equipment but did not use a fetal heart monitor. Because no complications were detected, Villarreal was released and told to return in a week.

Three days later, Villarreal again presented at Ben Taub complaining of a lack of fetal movement. She was placed on a fetal heart monitor, which revealed that the baby's heart rate was minimally reactive. First-year resident Dr. Charles Moniak evaluated Villarreal and determined that a biophysical profile ("BPP") was in order. He began the BPP, discovered no evidence of fetal movement, and called upon third-year resident Dr. Daniel Hersh to complete the evaluation. The results apparently showed that the baby had been motionless for the entire examination. According to Hersh, this necessitated an "urgent" caesarean section. He consulted with his supervising resident, Dr. Frank Mussemann, who concurred in the assessment.

During preparations for the operation, Villarreal experienced a contraction, and the fetal heart rate further decreased. Based on this development, Mussemann decided that a "stat" or "emergency" caesarean section was required. Dr. Rakesh Mangal was the attending physician in the obstetric unit at the time of delivery, although it is disputed to what degree he supervised or participated in the delivery. The infant Juan Pablo Elizondo was delivered by caesarean section; tests administered soon thereafter revealed that he had severe anemia due to a massive fetal-maternal hemorrhage, i.e., loss of the child's blood into the mother's system. Later, Elizondo was diagnosed with severe global developmental delay and mental retardation.

As next friend of Elizondo, Villarreal filed a series of lawsuits against their health care providers, alleging that the care providers' conduct caused, exacerbated, or failed to prevent Elizondo's injuries. In one lawsuit, Villarreal alleged medical malpractice against Drs. Plummer, Hersch, and Mussemann. *See Mussem-*

*ann v. Villarreal,* 178 S.W.3d 319 (Tex. App.-Houston [14th Dist.] 2005, pet. denied).[1] In the present lawsuit, she alleges medical malpractice against Drs. Saade, Belfort, Mangal, and Moniak.

In the court below, appellants filed a motion to dismiss the present lawsuit based on Texas Civil Practice & Remedies Code § 101.106(f), contending that because appellants were acting within the scope of their duties as state employees, the only proper defendant was their employer, Baylor College of Medicine. Certain appellants also filed a motion for summary judgment, asserting common law official immunity. The trial court denied both motions, and the current appeals ensued.

## II. Dismissal Under Section 101.106(f)

### A. Appellants' Contentions

■ Appellants challenge the trial court's denial of their motion to dismiss based on Texas Civil Practice & Remedies Code § 101.106(f). That section provides:

If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the

governmental unit as defendant on or before the 30th day after the date the motion is filed.

Tex. Civ. Prac. & Rem.Code § 101.106(f). As appellants correctly recognize, in order to be entitled to dismissal under this provision, they had to demonstrate that (1) they were employees of a governmental unit at the time of the conduct forming the basis of Villarreal's lawsuit; (2) said conduct was within the general scope of that employment; and (3) the lawsuit could have been brought against Baylor under the Texas Tort Claims Act ("TTCA"). *See id.; Phillips v. Dafonte,* 187 S.W.3d 669, 675 (Tex.App.-Houston [14th Dist.] 2006, no pet.).

It is uncontested that appellants were all Baylor employees during the relevant time period and that the conduct at issue fell within the scope of that employment. The key issues in dispute are (1) whether Baylor should be considered a governmental unit, and (2) if so, whether Villarreal could have brought suit against Baylor under the TTCA. In its order, the trial court specifically found against appellants on both issues.

We begin by addressing the question of whether Baylor should be considered a governmental unit in this context. Appellants contend that under the TTCA, all entities classified as "state agencies" also constitute "governmental units," citing Civil Practice and Remedies Code § 101.001(3)(A)-(D).[2] They further con-

---

1. As will be explained in greater detail below, in *Mussemann,* we held that the trial court properly denied the doctors' motion for summary judgment because the doctors failed to conclusively establish that they were entitled to common law official immunity. 178 S.W.3d at 320, 329–30. The opinion and disposition in the prior appeal informs but does not control certain of our holdings in the present appeal.

2. Section 101.001(3) defines "governmental unit" for purposes of the TTCA to mean:
 (A) this state and all the several agencies of government that collectively constitute the government of this state, including other agencies bearing different designations, and all departments, bureaus, boards, commissions, offices, agencies, councils, and courts;
 (B) a political subdivision of this state, including any city, county, school district,

tend that Baylor is a "supported medical school" under Texas Health and Safety Code § 312.002(6), and that when operating as a supported medical school, Baylor is a state agency and, thus, a governmental unit. Tex. Health & Safety Code § 312.002(6).[3] Appellants presented evidence in support of their motion to dismiss showing that Baylor meets the criteria for being a supported medical school; neither Villarreal nor the trial court has suggested otherwise. Accordingly, we shall narrow our analysis to the question of whether a private institution such as Baylor—acting in its capacity as a supported medical school—should be considered a state agency and thus a governmental institution for purposes of applying section 101.106(f).

■ Appellants contend that section 312.007(a) of the Health and Safety Code "expressly and unequivocally" provides that a supported medical school is a state agency. Section 312.007 states in its entirety:

(a) A medical and dental unit, supported medical or dental school, or coordinating entity is a state agency, and a director, trustee, officer, intern, resident, fellow, faculty member, or other associated health care professional or employee of a medical and dental unit, supported medical or dental school, or coordinating entity is an employee of a state agency for purposes of Chapter 104, Civil Practice and Remedies Code, and for purposes of determining the liability, if any, of the person for the person's acts or omissions while engaged in the coordinated or cooperative activities of the unit, school, or entity.

(b) A judgment in an action or settlement of a claim against a medical and dental unit, supported medical or dental school, or coordinating entity under Chapter 101, Civil Practice and Remedies Code, bars any action involving the same subject matter by the claimant against a director, trustee, officer, intern, resident, fellow, faculty member, or other associated health care professional or employee of the unit, school, or entity whose act or omission gave rise to the claim as if the person were an employee of a governmental unit against which the claim was asserted as provided under Section 101.106, Civil Practice and Remedies Code.

Tex. Health & Safety Code § 312.007.

Subsection (a), upon which our analysis must focus, can be broken down into four constituent clauses as follows:

(1) "A ... supported medical ... school ... is a state agency,"

(2) "a[n] employee of a ... supported medical ... school ... is an employee of a state agency,"[4]

(3) "for purposes of Chapter 104, Civil Practice and Remedies Code," and

junior college district, levee improvement district, drainage district, irrigation district, water improvement district, water control and improvement district, water control and preservation district, freshwater supply district, navigation district, conservation and reclamation district, soil conservation district, communication district, public health district, and river authority;

(C) an emergency service organization; and

(D) any other institution, agency, or organ of government the status and authority of which are derived from the Constitution of Texas or from laws passed by the legislature under the constitution.

Tex. Civ. Prac. & Rem.Code § 101.001(3).

3. Section 312.002(6) defines "supported medical school" as "a medical school ... organized as a nonprofit corporation that is under contract with the Texas Higher Education Coordinating Board to provide educational services under Subchapter D, Chapter 61, Education Code." Tex. Health & Safety Code § 312.002(6).

4. For simplicity purposes, we use the first "employee" in this excerpted phrase in place

(4) "for purposes of determining the liability, if any, of the person for the person's acts or omissions while engaged in the coordinated or cooperative activities of the . . . school. . . ."

Villarreal and the trial court interpret section 312.007(a) such that clauses 3 and 4 modify both clause 1 and clause 2. In other words, they conclude that a supported medical school is a state agency only for purposes of Chapter 104[5] and for purposes of determining the liability of an employee.[6] In contrast, appellants would have us read clause 1 as an independent clause unaffected by the remainder of the sentence, with clauses 3 and 4 modifying only clause 2 and not clause 1. Appellants base their argument primarily on the placement of the comma after the term "state agency" in clause 1.

### B. Standards of Review

■ We review a trial court's interpretation of an applicable statute under a de novo standard. *See Johnson v. City of Fort Worth*, 774 S.W.2d 653, 655–56 (Tex. 1989). In construing a statute, our objective is to determine and give effect to the legislature's intent. *See Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex.2000). If possible, we must ascertain that intent from the statutory language itself and not look to extraneous matters for guidance. *Id.* If the meaning of the statutory language is unambiguous, we will adopt the interpretation supported by the plain meaning of the provision's words. *St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex.1997). We must not engage in forced or strained construction; instead, we yield to the plain sense of the words the legislature chose. *See id.*

### C. Analysis[7]

■ According to appellants, pursuant to the rules of grammar, the placement of the comma after "state agency" in section

---

of the categorical list which includes: "director, trustee, officer, intern, resident, fellow, faculty member, or other associated health care professional or employee."

5. Chapter 104 of the Civil Practice and Remedies Code governs state indemnification of public servants for conduct in the scope of their office, employment, or contractual obligation with the state. *See* Tex. Civ. Prac. & Rem.Code § 104.001–.009.

6. In *Klein v. Hernandez*, the First Court of Appeals also concluded that clauses 3 and 4 modify both clause 1 and clause 2; however, in coming to that conclusion, the court did not specifically address the arguments appellants make in the present case. 260 S.W.3d 1, 7–8 (Tex.App.-Houston [1st Dist.] 2008, pet. filed). Accordingly, we will make no further reference to *Klein* in our analysis of subsection (a).

7. We previously denied without opinion Villarreal's motion to dismiss this interlocutory appeal for want of jurisdiction, a decision compelled by our prior precedent. *See Young v. Villegas*, 231 S.W.3d 1, 7–8 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (holding that Civil Practice and Remedies Code section 51.014(a) authorizes an interlocutory appeal based on Health and Safety Code section 312.007(a)); *Phillips*, 187 S.W.3d at 673–75 (holding that section 51.014(a) authorizes an interlocutory appeal based on Civil Practice and Remedies Code section 101.106(f) even when the underlying motion sought dismissal instead of summary judgment). We note, however, that this area of jurisdictional jurisprudence is highly unsettled. *See, e.g., Klein*, 260 S.W.3d at 9–10 (declining to follow *Young*); *Hudak v. Campbell*, 232 S.W.3d 930, 931 (Tex.App.-Dallas 2007, no pet.) (declining to follow *Phillips*); *see also Tex. A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 842–43 (Tex.2007) (attempting to clarify interpretation of section 51.014(a)(5)); *Klein*, 260 S.W.3d at 11–17 (Taft, J., concurring) (suggesting that the *Koseoglu* opinion is self-contradictory and that the *Klein* majority's interpretation of section 312.007(a) is too narrow). We further note with encouragement that the Texas Supreme Court has requested a response to the petition for review in *Klein*.

312.007(a) cuts off everything before the comma from the rest of the sentence, creating two exclusive, independent clauses: one containing just clause 1 identified above, and the other containing clauses 2, 3, and 4.[8] Appellants, however, do not recite any of the supposed rules of grammar on which they rely. "An independent clause expresses a complete thought and can stand alone as a sentence." *The Gregg Reference Manual* 553. (9th ed.2001). However, the mere fact that a clause is an independent clause does not mean that it cannot be modified by other elements within the sentence. *See, e.g., id.* at 25 (identifying at least one situation in which a single phrase can modify two separate independent clauses in the same sentence). Additionally, it appears that the comma in question was used for purposes of clarity. *See id.* at 38 (stating that a comma can be used for clarity and to prevent misreading). Subsection (a) is comprised of a single compound sentence. Although the comma after "state agency" provides a break after the first independent clause and the start of the second independent clause, it also keeps the first clause from running into the list which begins clause 2 ("a director, trustee, officer ..."). Without the comma, a reader might initially be confused as to where the first clause ends and the list at the start of the second clause begins. The comma in question does not by itself establish that clauses 3 and 4 (technically "adverbial phrases," *see id.* at 557) do not modify both independent clauses (i.e., clauses 1 and 2). Accordingly, we find appellants' grammatical argument unpersuasive.[9]

Looking at subsection (a) in its entirety and in the context in which it occurs, it seems unlikely and illogical for the legislature to have intended by the insertion of clause 1 in subsection (a) to make supported medical schools into state agencies for all purposes. *See generally In re J.A.J.*, 225 S.W.3d 621, 626 n. 7 (Tex.App.-Houston [14th Dist.] 2006) (choosing the statutory interpretation that appeared most logical given the statutory language and related case law), *rev'd in part on other grounds*, 243 S.W.3d 611 (Tex.2007). Section 312.007 is labeled "Individual Liability," and while the heading of a statutory provision is not determinative of its content, the entirety of section 312.007 is devoted to providing limitations on the potential liability of persons working for certain medical entities. *See generally In re Shaw*, 204 S.W.3d 9, 17 (Tex.App.-Texarkana 2006, pet. refused) (noting that a

---

8. Under appellants' construction, the first independent clause would read: "A ... supported medical ... school ... is a state agency." The second independent clause would read: "[An] employee of a ... supported medical ... school ... is an employee of a state agency for purposes of Chapter 104, Civil Practice and Remedies Code, and for purposes of determining the liability, if any, of the person for the person's acts or omissions while engaged in the coordinated or cooperative activities of the ... school...."

9. Although neither cited to nor relied upon by appellants, we are also mindful of the "last antecedent doctrine," which advises that generally, a relative or qualifying clause applies only to the immediately preceding words or clause. *E.g.*, 82 C.J.S. Statutes § 333 (1999).

This doctrine, however, is not a controlling canon of statutory construction but is merely an aid to construction. *See City of Corsicana v. Willmann*, 147 Tex. 377, 379, 216 S.W.2d 175, 176 (1949); 82 C.J.S. Statutes § 333. It does not apply if anything in the language, context, purpose, or subject matter of the statute suggests it should not. *See City of Corsicana*, 216 S.W.2d at 176; 82 C.J.S. Statutes § 333. As fully explained in the text, the language, purpose, context, subject matter, and legislative history of section 312.007(a) all indicate that the legislature intended for clauses 3 and 4 to apply to both clause 1 and clause 2 and not just to clause 2; consequently, the last antecedent doctrine does not govern interpretation of this statute.

statute's title must give fair notice of the statute's contents but ultimately the language of the statute controls its meaning). Dropping in a provision that supported medical schools (and certain other medical entities) are state agencies for all purposes—a mandate that could have far reaching effects—in the middle of this section otherwise dealing only with individual liability makes no sense. Further still, had the legislature intended to say in section 312.007 that such entities were state agencies for all purposes, it would have been more logical to put such an important pronouncement in its own separately lettered subsection, or at a minimum, to put it in a separate sentence within subsection (a), most helpfully with an indication that the pronouncement was for all purposes and not just for the purposes enunciated in section 312.007. Coherence requires that clauses 3 and 4 modify not only clause 2 but clause 1 as well.

Appellants further argue that reading clauses 3 and 4 as modifying clause 1 would render subsection (a) senseless. To make this point, they offer a merged version of clause 1 with clauses 3 and 4, as follows: "[A] supported medical . . . school . . . is a state agency for purposes of Chapter 104 . . . and for purposes of determining the liability, if any, of the person for the person's acts or omissions while engaged in the coordinated or cooperative activities of the . . . school. . . ." This interpretation is fallacious. Eliminating clause 2 from subsection (a) would render the subsection unclear, in large part because clause 4 refers back to 2 (for a definition of "person") and thus without clause 2, clause 4 makes no sense regardless of whether it modifies clause 1 or not. We cannot ig-

nore that the subsection does in fact contain clause 2. Reading all four clauses together makes it clear that a supported medical school is a state agency and an employee of a supported medical school is an employee of a state agency for purposes of Chapter 104 and for purposes of determining the employee's liability under certain circumstances. The subsection neither says nor stands for more than that.

In their reply brief, appellants additionally argue that the legislative history of Chapter 312 evinces an intent to equalize the level of potential liability between private medical institutions and governmental institutions when those institutions engage in cooperative or coordinated health care services, citing House Committee on Higher Education, Bill Analyses, Tex. S.B. 1062, 71st Leg., R.S. (1987).[10] The cited history does support the contention that the legislature desired to equalize potential liability between cooperating institutions; however, viewed more specifically, the cited history supports rather than refutes the interpretation of section 312.007(a) as providing that a supported medical school is a state agency only for purposes of Chapter 104 and for purposes of determining the liability of an employee. In other words, the cited history supports the conclusion that clauses 3 and 4 of subsection (a) modify both clause 1 and clause 2.

To begin with, the two bill analyses do not state at any point that supported medical schools should be considered state agencies for all purposes rather than just for the purposes stated in section 312.007(a). More importantly, in offering a synopsis of the specific language at issue here, one of the bill analyses states that

10. Appellants actually cite two separate bill analyses by the same committee; however, the "Green Book" rules of citation do not provide a method for distinguishing between the two documents. *See Texas Rules of Form* 14.3, at 66 (Texas Law Review Ass'n et al. eds., 11th ed.2006). One bill analysis refers to committee action on May 7, 1987; the other does not; neither is otherwise dated.

the employees of the private institutions "shall be deemed employees of a state agency and the unit, school, or entity shall be deemed a state agency for purposes of the Civil Practice and Remedies Code, and for purposes of determining liability while engaged in coordinated or cooperative activities." The other bill analysis states similarly that "the unit, school, or entity shall be deemed a state agency for purposes of Chapter 104, Civil Practice and Remedies Code, and for purposes of determining liability while engaged in coordinated or cooperative activities." Both bill analyses reverse the order of clauses 1 and 2 from how they are presented in the final statute, thus confirming that both clause 1 and clause 2 are intended to be modified by clauses 3 and 4 regardless of their order in the sentence. In short, the legislative history cited by appellants actually supports the interpretation proffered by Villarreal and adopted by the trial court and not that proposed by appellants. Based on the foregoing, we find that appellants' argument that section 312.007(a) makes Baylor a state agency for all purposes—and thus a governmental unit under Civil Practice & Remedies Code § 101.106(f)—is without merit.

██ Lastly, in one paragraph of their reply brief, appellants suggest that even if section 312.007(a) is interpreted to mean that supported medical schools are state agencies only for the limited purposes of chapter 104 and of determining liability, Baylor should be deemed a state agency in this case because this lawsuit seeks to determine appellants' liability.[11] However, by moving for dismissal under section 101.106(f), appellants asserted *immunity from suit* not *immunity from liability*.

*See Phillips,* 187 S.W.3d at 672–73 (describing section 101.106(f) as authorizing immunity from suit); *see generally Baylor Coll. of Med. v. Hernandez,* 208 S.W.3d 4, 9–10 (Tex.App.-Houston [14th Dist.] 2006, pet. denied) (distinguishing between statutes granting immunity from suit and statutes granting immunity from liability).

In their reply brief, appellants offer no argument as to how the reference to determining liability in section 312.007(a) could encompass immunity from suit under section 101.106(f). Indeed, immunity from suit precludes a determination of liability; thus, the statement in section 312.007(a) that supported medical schools are state agencies for purposes of determining liability would not appear to apply to section 101.106(f), which provides a method for avoiding altogether a determination of liability.

██ In their motion for rehearing, appellants argue that the phrase "determining liability" in section 312.007(a) encompasses both determinations of immunity from liability as well as determinations of immunity from suit. They assert that the term "liability" in this context is broader than the phrase "immunity from liability." They further support this argument by renewed reference to legislative history (discussed above), wherein the legislature to some degree expressed an intent to level the field of liability faced by private and public medical entities when cooperating to provide patient care at public facilities. One problem with appellants' new interpretation, reading "determining liability" so as to encompass immunity from suit, is that it would render paragraph (b)

---

11. It is unclear whether appellants made this argument in the trial court. However, because it may have been encompassed by appellants' generalized trial arguments, we will address it here in the interest of justice and

completion. *See generally Wohlfahrt v. Holloway,* 172 S.W.3d 630, 639–40 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) ("[A] party's argument on appeal must comport with its argument in the trial court.").

of section 312.007 meaningless. Paragraph (b) bars any action against an employee of a supported medical school when there has already been a judgment or settlement entered in a claim against the medical school based on the same subject matter, "as if the person were an employee of a governmental unit ... as provided under Section 101.106." *See generally Tex. Dept. of Agric. v. Calderon*, 221 S.W.3d 918, 922 (Tex.App.-Corpus Christi 2007, no pet.) (holding that "bars any suit" language in a statute provides an unequivocal grant of immunity from suit). If the legislature intended in paragraph (a) to make employees of supported medical schools immune from suit just like state employees, as appellants now argue, there would have been no reason for the legislature to then grant one specific type of governmental employee immunity from suit in paragraph (b). When possible, we must not interpret one portion of a statute so as to render another portion of the statute meaningless. *See* Tex. Gov't Code § 311.021; *Tex. Mun. Power Agency v. Public Util. Comm'n of Tex.*, 253 S.W.3d 184, 199 (Tex.2008); *see also Bexar Metro. Water Dist. v. City of San Antonio*, 228 S.W.3d 887, 898 (Tex.App.-Austin 2007, no pet.) (citing section 311.021 in interpreting a statute so as not to be redundant). Consequently, we reject appellants' motion for rehearing argument.

The trial court did not err in denying appellants' motion to dismiss based on section 101.106(f). Because of our resolution of this issue, we need not address the subsidiary issue of whether Villarreal could have sued Baylor. Accordingly, we overrule appellants' two issues in cause

number 14–07–00736–CV. We also overrule appellant's motion for rehearing.

## III. Common Law Official Immunity

In cause number 14–07–00926–CV, appellants Saade, Belfort, and Mangal [12] challenge the trial court's denial of their motion for summary judgment based on common law official immunity.[13] In their first issue, appellants contend that our prior opinion in a related case is not dispositive of the present appeal under the "law of the case" doctrine. In their second issue, appellants contend that the trial court erred in determining that they failed to establish their right to common law official immunity. In their third issue, appellants urge us to reconsider the *Kassen* rule insofar as the Texas Supreme Court has unfairly placed an additional and unwarranted burden on medical care providers in government service. *Kassen v. Hatley*, 887 S.W.2d 4, 8 (Tex.1994).

### A. Standards of Review

■ Official immunity constitutes an affirmative defense; thus, to be entitled to summary judgment, appellants had to conclusively establish each element. *Kassen*, 887 S.W.2d at 8. To meet this burden, appellants must demonstrate that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *Id.* at 8 n. 2. We review a trial court's denial of summary judgment de novo. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex.2004). In determining whether an issue of material fact exists, we take as true all evidence favorable to the nonmovant and indulge all

---

**12.** By use of the term "appellants" in this portion of the opinion, we refer to Saade, Belfort, and Mangal.

**13.** We previously held in a related case that we have jurisdiction over such an interlocu-

tory appeal under section 51.014(a)(5) of the Civil Practice and Remedies Code. *Mussemann v. Villarreal*, 178 S.W.3d 319, 321 n. 1 (Tex.App.-Houston [14th Dist.] 2005, pet. denied).

reasonable inferences in the nonmovant's favor. *Kassen*, 887 S.W.2d at 8 n. 2.

■■■ To establish a defense of official immunity, public employees must prove the following elements: (1) the performance of a discretionary function, (2) in good faith, and (3) within the scope of the employee's authority. *Kassen*, 887 S.W.2d at 9. Government-employed medical personnel must further establish that they are being sued for the exercise of "governmental" rather than strictly "medical" discretion. *Id.* at 10–11; *Mussemann v. Villarreal,* 178 S.W.3d 319, 323 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). "Governmental discretion" in this context generally refers to actions taken in an administrative or policy-making capacity and excludes strictly medical decision-making. *Kassen*, 887 S.W.2d at 11 & n. 7; *Mussemann*, 178 S.W.3d at 323–24. Both *Kassen* and *Mussemann* suggest that the actual treatment of individual patients will generally require the exercise of only medical as opposed to governmental discretion and, thus, will not occasion immunity. *Kassen*, 887 S.W.2d at 10–11 & n. 7; *Mussemann*, 178 S.W.3d at 324.

■■■ In discussing the distinction between governmental discretion and medical discretion, the *Kassen* court indicated that government-employed medical personnel exercise governmental discretion when they: (1) exercise policy-making or administrative responsibilities not shared by private-sector providers, or (2) decide how to allocate a scarce pool of state resources among possible recipients. 887 S.W.2d at 10. The court further stated

that if governmental factors and concerns colored the discretion of government-employed medical personnel, policy considerations may call for immunity, even though these personnel have duties and responsibilities that coincide with private-sector providers. *Id.* at 12. Thus, the issue does not turn specifically on whether the discretion at issue was "uniquely governmental"; instead, we must examine the facts of the particular case in relation to the underlying policies promoted by official immunity. *Id.*[14] While the *Kassen* court declined to draw a bright line for determining when discretionary acts are governmental rather than medical in nature, it did recommend consideration of the following factors:

1. the nature and importance of the function that the employee is performing,

2. the extent to which passing judgment on the exercise of discretion by the employee will amount to passing judgment on the conduct of a coordinate branch of government or an agency thereof,

3. the extent to which the imposition of liability would impair the employee's free exercise of discretion,

4. the extent to which financial responsibility will fall on the employee,

5. the likelihood that harm will result to the public if the employee acts,

6. the nature and seriousness of the type of harm that may be produced, and

7. the availability to the injured party of other remedies and forms of relief.

*Id.* at 12 n. 8 (citing Restatement (Second) of Torts § 895D cmt. f (1977)).[15]

---

14. In their arguments, appellants suggest that the *Kassen* court authorized official immunity for either an exercise of governmental discretion or for when an exercise of medical discretion is colored by governmental factors, citing *Kassen*, 887 S.W.2d at 12. However, as we explained in *Mussemann*, the *Kassen* language on which appellants rely for this assertion merely helps explain when discretion is governmental; it does not create a separate criterion independent from governmental discretion. *Mussemann*, 178 S.W.3d at 328–29.

15. It is unclear exactly how or when the *Kassen* court intended for the factors it identified

## B. *Mussemann v. Villarreal*

 The parties initially dispute to what extent our opinion in *Mussemann,* which involved the same plaintiff and the same alleged harm, controls our decision in the present appeal. Specifically, in their first issue, appellants attempt to differentiate their situations from those confronted by the doctors in *Mussemann* by pointing out that they (appellants) were only supervisors and did not actually perform any procedures on Villarreal. This distinction is not strictly accurate. *Mussemann* involved two doctors, Mussemann and Hersch, who were being sued, at least in part, because of their supervision of other defendants. In regards to these allegations, we stated that "supervising the medical decision-making of less-experienced doctors, along with determining when to consult more-experienced physicians, are the exercise of medical discretion." *Mussemann,* 178 S.W.3d at 325. Appellants additionally have attempted to distance themselves from *Mussemann* by providing more evidence regarding the nature of practice at Ben Taub Hospital. We agree that because (1) the order before us is the denial of a summary judgment, (2) the defendants are different than those in *Mussemann,* and (3) additional evidence has been presented, *Mussemann* does not control the current appeal as "law of the case"; *Mussemann* does, however, guide our analysis. *See generally Loram Maint. of Way, Inc. v. Ianni,* 210 S.W.3d 593, 596 (Tex.2006) (discussing "law of the case" doctrine); *Briscoe v. Goodmark Corp.,* 102 S.W.3d 714, 716 (Tex.2003) (same).[16]

to be used. Beyond listing them, the court neither specifically analyzed them nor obviously employed them in *Kassen* itself. 887 S.W.2d at 12 n. 8. We did likewise in *Mussemann.* 178 S.W.3d at 324.

**16.** Appellants' first issue addresses the framework of our analysis and does not urge a

## C. Governmental Versus Strictly Medical Discretion

In their second issue, appellants assign error to the trial court's holding that they failed to establish as a matter of law their entitlement to common law official immunity. Appellants maintain that they established exercise of governmental discretion by virtue of their supervision of government healthcare providers in a government hospital. More specifically, appellants argue that given the responsibilities and constraints associated with working at Ben Taub, their supervision was an exercise of governmental discretion because it was significantly colored by governmental factors and constituted an administrative duty involving the allocation of state resources. They emphasize that physicians in the private sector are not required to perform these functions under the exact conditions that exist at Ben Taub, particularly the large patient population and the ratio of supervising doctors to residents. They further make arguments based on the seven factors identified in *Kassen* and emphasize the dearth of evidence regarding the precise nature of Mangal's supervision of delivery.

### 1. Practice and Conditions at Ben Taub

 It is clear from the pleadings in this lawsuit and the proceedings thus far that Villarreal is suing appellants for medical decision-making and the supervision of medical decision-making in relation to her pregnancy and the delivery of Juan

particular outcome. While we generally agree with the point made—that *Mussemann* does not control as law of the case—the issue does not necessarily lead to a ruling favoring appellants. Accordingly, we decline to formally rule.

Pablo Elizondo. Appellants recognize that the mere fact of a government hospital environment does not necessarily render their supervision governmental in nature when similar supervision in the private sector would clearly not be governmental. *See Kassen,* 887 S.W.2d at 11 (rejecting blanket immunity for government medical personnel). Instead, appellants argue that governmental factors colored their medical decision-making and supervision such that policy concerns warrant application of official immunity.[17]

■ Appellants presented evidence that Ben Taub supervising physicians, such as themselves, must supervise more healthcare providers treating more patients than do supervising physicians in private sector obstetric units.[18] They further presented evidence that the healthcare providers under their supervision tended to have less experience and greater responsibilities than in the typical private sector situation and that patients at public facilities often have more risk factors than do patients in private facilities. In *Mussemann,* we pointed out that the difficulties appellants highlight at Ben Taub (the alleged "governmental factors" coloring their decision-making) are likely present in most or all public hospitals; thus, to hold that the existence of these factors conclusively establishes a right to official immunity would render the *Kassen* analysis practically meaningless. *Mussemann,* 178 S.W.3d at 326. While public hospital supervision may be more difficult, this characteristic alone does not render conduct governmental when it otherwise would not be. It is the nature of the decision being made, not its complexity, that renders it governmental. Indeed, strictly medical decisions may often be more difficult and complex than decisions involving governmental discretion. *See generally Kassen,* 887 S.W.2d at 11 ("government-employed medical personnel exercise considerable judgment and deliberation in performing their medical duties"). Ultimately, in the present case, discretion was exercised in the treatment of an individual patient. The courts in *Kassen* and *Mussemann* both emphasized that discretion exercised in the treatment of individual patients is generally medical in nature, not governmental. *See Kassen,* 887 S.W.2d at 10–11 & n. 7; *Mussemann,* 178 S.W.3d at 324.

■ Governmental discretion, on the other hand, typically occurs when government physicians: (1) exercise policy-making or administrative responsibilities not shared by private-sector providers, or (2) decide how to allocate a scarce pool of state resources among possible recipients. *Kassen,* 887 S.W.2d at 10. Appellants additionally argue that they had administrative duties and were allocating scarce government resources, citing as an example only the allocation of their own time. The problem with this assertion is that it is too broad: *every* physician in a government hospital (and even in private settings) is required to allocate his or her time among patients. Thus, if a physician's allocation of his or her own time were sufficient for official immunity, then every government physician would be entitled to immunity without the need for further analysis: *Kassen* would again be rendered meaning-

---

17. As explained in footnote 14 above, the "colored by governmental factors" analysis is part of, not independent from, the governmental discretion/purely medical discretion analysis. *Supra* n. 14; *see also Mussemann,* 178 S.W.3d at 328–29.

18. While appellants generally discuss the constraints on their time as supervisors at Ben Taub, they stop short of asserting that they were unable to spend time on Villarreal's care because of these constraints.

less.[19] Under both *Kassen* and *Mussemann*, we must draw a distinction between decisions made in the treatment of individual patients (such as whether a supervisor should become more involved in a particular patient's care under the circumstances) and decisions that make policy or determine how to allocate resources. *Kassen*, 887 S.W.2d at 10–11 & n. 7; *Mussemann*, 178 S.W.3d at 323–24. Appellants' decisions regarding the level of their involvement with Villarreal were specific treatment decisions for an individual patient, not a generalized policy-making or allocation decision; thus, under *Kassen* and *Mussemann*, these decisions were purely medical in nature and not governmental.[20]

## 2. The Seven Kassen Factors

We now turn to the seven factors identified in *Kassen*. Appellants tacitly acknowledge that three of the factors do not support finding official immunity in this case (as numbered in *Kassen*): (4) the extent to which financial responsibility will fall on the employee, (5) the likelihood that harm will result to the public if the employee acts, and (6) the nature and seriousness of the type of harm that may be produced. Turning to the first listed factor—the nature and importance of the function that the employee is performing—appellants emphasize the important role that supervising physicians play at Ben Taub. While we acknowledge its impor-

tance, the role played by the physicians here appears to be a medical one: supervising the care of individuals. *Kassen*, 887 S.W.2d at 10–11 & n. 7; *Mussemann*, 178 S.W.3d at 323–24. Even though supervision at Ben Taub may be a difficult and important task, appellants have not shown that it typically involves governmental rather than medical discretion.

In discussing the second factor—the extent to which passing judgment on the exercise of discretion will amount to passing judgment on the conduct of a coordinate branch of government or an agency thereof—appellants argue that examining their conduct will require passing judgment on the very model of care employed at Ben Taub. We do not agree. Villarreal's claims attack appellant's individual medical decision-making regarding a single patient, not the overall scheme of care at Ben Taub.

Addressing the third factor—the extent to which the imposition of liability would impair the employee's free exercise of discretion—appellants argue that imposing liability would require Ben Taub supervising physicians to personally observe or perform all procedures in the future. We disagree. Villarreal's complaints are principally that the supervising physicians made negligent medical decisions and failed to properly supervise, not that they

---

19. Villarreal's allegations are not limited to complaints that appellants did not devote enough time to her care; she also challenges specific treatment decisions. Appellants do not argue that these specific treatment decisions were governmental in nature; it would be difficult to argue that the decision to perform a procedure (e.g., a BPP or amniocentesis) was the result of the need to allocate scarce resources.

20. In *Kassen*, the physician-defendants argued that the need to allocate scarce state resources influenced their decision to not ad-

mit a patient to a government facility. 887 S.W.2d at 12. The supreme court refused to rule on the merits of this argument because in the trial court, the defendants argued only that admission was not proper based on therapeutic considerations. *Id.* It is therefore unclear in *Kassen* whether a decision to admit a patient could be considered governmental in nature. Nonetheless, the decision to admit is typically a more generalized, policy-oriented determination than are specific treatment decisions once a patient has been admitted to a facility.

should have performed every procedure themselves.

Lastly, concerning factor seven—the availability to the injured party of other remedies and forms of relief—appellants point out that Villarreal could recover for her injuries from Baylor as well as from the residents who performed the procedures in question. While the argument may be correct, this single factor does not outweigh the other six in the analysis. Examined together, the seven factors identified in *Kassen* support our conclusion that appellants have not established their entitlement to official immunity.

### 3. Dr. Mangal

 Subsidiary to their primary argument that they established official immunity as a matter of law, appellants point out the alleged dearth of proof that Mangal actively supervised any aspect of Villarreal's care. Appellants claim to have conclusively proved that Mangal was not consulted regarding Villarreal's care and did not personally examine her. In support, they offer only Mangal's affidavit attached to the motion for summary judgment. In this affidavit, Mangal states that he was the "on-call supervising physician" in Obstetrics and Gynecology at Ben Taub on the night Elizondo was born. Mangal states that he was physically present in the Labor and Delivery Unit that night and was available to the residents for consultation. He indicates that he generally becomes involved in a particular patient's care only if consulted. He does not "recall whether [he] was consulted regarding Ms. Villarreal ... whether [he] ever became aware of her presence on the unit before her delivery [or] whether [he] was physically present at Ms. Villarreal's bedside or in the operating room during her cesarean section." This affidavit establishes only that (1) Mangal was present as a supervi-

sor in the unit when Villarreal gave birth, and (2) he does not remember whether or not he was directly involved in Villarreal's care. Moreover, Villarreal introduced evidence that Mangal signed Villarreal's chart as having "supervised" her delivery, although Mangal stated that he often signed charts in this manner simply to show that he was on call and available for consultation. Appellants' argument regarding Mangal appears aimed more at demonstrating that he did not exercise any discretion at all, not that he exercised governmental discretion. In order to be entitled to summary judgment on official immunity, appellants (including Mangal) were required to show that they exercised governmental discretion. *See Kassen,* 887 S.W.2d at 10–11; *Mussemann,* 178 S.W.3d at 323. The evidence concerning whether Mangal actually supervised Villarreal's care goes to the issue of liability, not the exercise of governmental discretion. Based on the foregoing analysis, we find that appellants failed to conclusively demonstrate their entitlement to summary judgment based on official immunity. Accordingly, we overrule appellants' second issue.

### D. *Kassen* Revisited

 In their third issue, appellants argue that the Texas Supreme Court acted unfairly in *Kassen* by requiring government physicians to meet an additional burden, i.e., proving that their conduct involved governmental rather than medical discretion, to be entitled to common law official immunity. As we explained in *Mussemann,* the supreme court has considered and rejected appellants' arguments, and as an intermediate appellate court, we may neither re-evaluate the supreme court's pronouncements nor refuse to apply them where applicable. 178 S.W.3d at 329 (citing *In re K.M.S.,* 91 S.W.3d 331 (Tex.2002)). Accordingly, we

528

overrule appellants' third issue in cause number 14–07–00926–CV. Because we find no merit in any of appellants' arguments concerning the propriety of the trial court's denial of the motion for summary judgment, we affirm the trial court's order.

## IV. Disposition

In cause number 14–07–00736–CV, we affirm the trial court's denial of appellants' motion to dismiss. In cause number 14–07–00926–CV, we affirm the trial court's denial of the motion for summary judgment.

GUZMAN, J. Concurring.

## CONCURRING OPINION

EVA M. GUZMAN, Justice.

I join in the majority's analysis and disposition of the appeal of cause number 14–07–00926–CV, and respectfully concur in the result reached in cause number 14–07–00736–CV.

To construe a statute, we must ascertain the Legislature's intent, and we begin with the plain and ordinary meanings of the words the Legislature selected. *FKM P'ship, Ltd. v. Bd. of Regents of the Univ. of Houston Sys.*, 255 S.W.3d 619, 633 (Tex. 2008); *City of Marshall v. City of Uncertain*, 206 S.W.3d 97, 105 (Tex.2006). Here, the relevant statute consists of a single compound sentence in which two independent clauses are joined by the conjunction "and":

A medical and dental unit, supported medical or dental school, or coordinating entity is a state agency,

and

a director, trustee, officer, intern, resident, fellow, faculty member, or other associated health care professional or employee of a medical and dental unit,

supported medical or dental school, or coordinating entity is an employee of a state agency for purposes of Chapter 104, Civil Practice and Remedies Code, and for purposes of determining the liability, if any, of the person for the person's acts or omissions while engaged in the coordinated or cooperative activities of the unit, school, or entity.

TEX. HEALTH & SAFETY CODE ANN. § 312.007(a) (Vernon 2001). In parsing this sentence, we are governed by the Code Construction Act. *Id.* § 1.002 ("Chapter 311, Government Code (Code Construction Act), applies to the construction of each provision in this code except as otherwise expressly provided by this code.").

The Code Construction Act contains both mandatory and discretionary provisions. *Compare* TEX. GOV'T CODE ANN. §§ 311.016(1) (Vernon 2005) (" 'May' creates discretionary authority or grants permission or a power.") and 311.023 (listing statutory construction aids that a court "may" consider) *with id.* §§ 311.016(2) (" 'Shall' imposes a duty.") and 311.026(a) ("If a general provision conflicts with a special or local provision, the provisions *shall* be construed, if possible, so that effect is given to both.") (emphasis added). In one such mandatory provision, the Legislature instructs us that "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage." *Id.* § 311.011(a).

One such grammatical rule is the doctrine of the last antecedent, under which a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows. *Barnhart v. Thomas*, 540 U.S. 20, 26, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003). *See also* 2A N. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION § 47.33 (6th ed. 2000) ("Referential and qualifying words and phrases,

where no contrary intention appears, refer solely to the last antecedent").[1] Such modifying "words, phrases, and clauses are not to be construed as extending to or modifying others which are more remote...." 82 C.J.S. *Statutes* § 333 (1999).

This canon of statutory construction is "neither controlling nor inflexible." *City of Corsicana v. Willmann,* 147 Tex. 377, 379, 216 S.W.2d 175, 176 (1949). Moreover, it is inapplicable "when a further extension is clearly required by the intent and meaning of the context." *Id. See also Stracener v. United Servs. Auto. Ass'n,* 777 S.W.2d 378, 383 (Tex.1989) ("Such doctrines must give way when there are indications that they are inapplicable."). Here, however, the context of the language at issue neither indicates nor requires a different construction. The limiting phrases at issue describe two purposes for which certain persons are deemed to be employees of a state agency. Both of those purposes are concerned solely with the liability arising from the acts or omissions of individuals, such as those described in the second independent clause, rather than the conduct of organizations listed in the first independent clause. Thus, the language used in the statute does not indicate that the limiting phrases were intended to apply to supported medical schools.

The title of the statute also offers no guidance. The majority correctly points out that section 312.007 is labeled "Individual Liability," but the Code Construction Act informs us that "[t]he heading of a title, subtitle, chapter, subchapter, or section does not limit or expand the meaning of a statute." TEX. GOV'T CODE ANN. § 311.024. Finally, the general legislative

pronouncement that supported medical schools are state agencies does not require such organizations to be treated as state agencies for all purposes. *See id.* § 311.026 (explaining that special or local provisions prevail over general provisions).

In sum, courts generally must construe an unambiguous statute by "adopt[ing] the interpretation supported by the statute's plain language unless that interpretation would lead to absurd results." *Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.,* 145 S.W.3d 170, 177 (Tex. 2004). "[P]rior law and legislative history cannot be used to alter or disregard the express terms of a code provision when its meaning is clear from the code when considered in its entirety, unless there is an error such as a typographical one." *Fleming Foods of Tex., Inc. v. Rylander,* 6 S.W.3d 278, 284 (Tex.1999). *See also Entergy Gulf States, Inc. v. Summers,* 50 Tex. Sup.Ct. J. 1140, 2007 WL 2458027, at *3 (2007) ("The general statement that a recodification is not intended to effect substantive changes does not, however, override the plain wording of the statutory provisions directly in issue in this case.") (reh'g granted). For this reason, I respectfully disagree with the majority's conclusion that a supported medical school is a state agency only for purposes of Chapter 104 and for the purpose of determining the liability of an employee.

I nevertheless concur in the majority's disposition of this issue for the independent reason that appellants failed to establish that the plaintiffs could have filed suit against Baylor College of Medicine under the Texas Tort Claims Act. Even assuming that the school is a "governmental unit" as

---

1. *Cf. Ludwig v. State,* 931 S.W.2d 239, 241 (Tex.Crim.App.1996) (en banc) ("Generally, the presence of a comma separating a modifying clause in a statute from the clause immediately preceding is an indication that the

modifying clause was intended to modify all the preceding clauses and not only the last antecedent one." (quoting 82 C.J.S. *Statutes* § 334 (1953))) (now *see* 82 C.J.S. *Statutes* § 333 (1999)).

that term is used in section 101.106(f) of the Texas Civil Practice and Remedies Code, the plaintiffs' allegations do not describe a situation in which the use or misuse of tangible personal property actually caused the harm at issue. *Cf. Tex. Dep't of Criminal Justice v. Miller,* 51 S.W.3d 583, 588 (Tex.2001) ("Using that property must have actually caused the injury.... [Patient's condition that] became progressively worse due to the passage of time and an alleged error in medical judgment ... [does not demonstrate the] 'use' of tangible personal property that 'caused' injury.").