Appellant=s Motion for Rehearing En Banc Denied; Affirmed, Majority and
Concurring Opinions of December 23, 2008 Withdrawn, and Majority and Concurring
Opinions filed February 26, 2009














 

Appellant=s Motion for Rehearing En Banc Denied; Affirmed,
Majority and Concurring Opinions of December 23, 2008 Withdrawn, and Majority
and Concurring Opinions filed February 26, 2009.

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00736-CV

____________

 

GEORGE SAADE, M.D., MICHAEL BELFORT,
M.D., RAKESH MANGAL, M.D., AND CHARLES MONIAK, M.D., Appellants

 

V.

 

MERCEDES VILLARREAL, AS NEXT FRIEND
OF JUAN PABLO ELIZONDO, A MINOR, Appellee

 

____________

 

NO. 14-07-00926-CV

____________

 

GEORGE SAADE, M.D., MICHAEL BELFORT, M.D., RAKESH
MANGAL, M.D., Appellants

 

V.

 

MERCEDES VILLARREAL, AS NEXT FRIEND
OF JUAN PABLO ELIZONDO, A MINOR, Appellee





On Appeal from the 129th
District Court

Harris County,
Texas

Trial Court Cause No. 2007-20855





 

 

M A J O R I T Y   O P I N I O N

We withdraw our opinion of December 23, 2008, issue the
following opinion on rehearing, and overrule appellants= motion for
rehearing.

These consolidated interlocutory appeals stem from a
medical malpractice lawsuit filed by appellee,
Mercedes Villarreal, as next friend of Juan Pablo Elizondo,
a minor, against appellants, George Saade, Michael Belfort, Rakesh Mangal, and Charles Moniak. 
In cause number 14-07-00736-CV, all of the appellants challenge the trial court=s order denying
their motion to dismiss based on Texas Civil Practice & Remedies Code ' 101.106(f),
requiring dismissal of a lawsuit against a governmental employee under certain
circumstances.  In cause number 14-07-00926-CV, appellants Saade, Belfort, and Mangal
challenge the trial court=s order denying their motion for summary
judgment based on common law official immunity.  We affirm both orders.

I.  Background

 

In late 1994, near the end of her pregnancy, Mercedes
Villarreal was referred to the High Risk Obstetric Clinic at Ben Taub
 General Hospital. 
The Harris County Hospital District owns and operates Ben Taub,
and the hospital is staffed largely by faculty and students from Baylor College
of Medicine.  On April 12, 1995, Villarreal presented at the clinic
complaining of no fetal movement.  Upon examination, the fetus was found
to be in a breech position.  After external manipulation failed to remedy
the problem and Villarreal declined a trial of labor, delivery by caesarean
section became the most promising option.  Based on this determination and
a diagnosis of gestational diabetes, which can compromise fetal lung maturity,
Villarreal was advised to undergo a third‑trimester amniocentesis to make
sure the baby=s lungs had matured sufficiently.  After
attending physicians Dr. Michael Belfort and Dr.
George Saade approved the procedure, Dr. Amy Plummer,
a third-year resident, performed the amniocentesis on April 20, 1995. 
Plummer then monitored the baby for five to ten minutes using ultrasound
equipment but did not use a fetal heart monitor.  Because no complications
were detected, Villarreal was released and told to return in a week.

Three days later, Villarreal again presented at Ben Taub complaining of a lack of fetal movement.  She was
placed on a fetal heart monitor, which revealed that the baby=s heart rate was
minimally reactive.  First‑year resident Dr. Charles Moniak evaluated Villarreal and determined that a
biophysical profile (ABPP@) was in
order.  He began the BPP, discovered no evidence of fetal movement, and
called upon third-year resident Dr. Daniel Hersh to
complete the evaluation.  The results apparently showed that the baby had
been motionless for the entire examination.  According to Hersh, this necessitated an Aurgent@ caesarean
section.  He consulted with his supervising resident, Dr. Frank Mussemann, who concurred in the assessment.

During preparations for the operation, Villarreal
experienced a contraction, and the fetal heart rate further decreased. 
Based on this development, Mussemann decided that
a Astat@ or Aemergency@ caesarean section
was required.  Dr. Rakesh Mangal
was the attending physician in the obstetric unit at the time of delivery, although it is disputed to what degree he
supervised or participated in the delivery.  The infant Juan Pablo Elizondo was delivered by caesarean section; tests
administered soon thereafter revealed that he had severe anemia due to a
massive fetal‑maternal hemorrhage, i.e., loss of the child=s blood into the
mother=s system. 
Later, Elizondo was diagnosed with severe global
developmental delay and mental retardation.  

 

As next friend of Elizondo, Villarreal
filed a series of lawsuits against their health care providers, alleging that
the care providers= conduct caused, exacerbated, or failed to
prevent Elizondo=s injuries. 
In one lawsuit, Villarreal alleged medical malpractice against Drs. Plummer, Hersch, and Mussemann.  See Mussemann v. Villarreal, 178
S.W.3d 319 (Tex. App.CHouston [14th Dist.]
2005, pet. denied).[1] 
In the present lawsuit, she alleges medical malpractice against Drs. Saade, Belfort, Mangal,
and Moniak.

In the court below, appellants filed a motion to dismiss
the present lawsuit based on Texas Civil Practice & Remedies Code ' 101.106(f),
contending that because appellants were acting within the scope of their duties
as state employees, the only proper defendant was their employer, Baylor
College of Medicine.  Certain appellants also filed a motion for summary
judgment, asserting common law official immunity.  The trial court denied
both motions, and the current appeals ensued.

II.  Dismissal Under Section 101.106(f)

A.  Appellants= Contentions

Appellants challenge the trial court=s denial of their
motion to dismiss based on Texas Civil Practice & Remedies Code ' 101.106(f). 
That section provides:

If a suit is filed against an employee
of a governmental unit based on conduct within the general scope of that
employee=s employment and
if it could have been brought under this chapter against the governmental unit,
the suit is considered to be against the employee in the employee=s official
capacity only.  On the employee=s motion, the suit
against the employee shall be dismissed unless the plaintiff files amended
pleadings dismissing the employee and naming the governmental unit as defendant
on or before the 30th day after the date the motion is filed.

 

Tex.
Civ. Prac. & Rem. Code ' 101.106(f).  As appellants correctly
recognize, in order to be entitled to dismissal under this provision, they had
to demonstrate that (1) they were employees of a governmental unit at the time
of the conduct forming the basis of Villarreal=s lawsuit; (2)
said conduct was within the general scope of that employment; and (3) the
lawsuit could have been brought against Baylor under the Texas Tort Claims Act
(ATTCA@).  See
id.; Phillips v. Dafonte, 187 S.W.3d 669,
675 (Tex. App.CHouston [14th Dist.] 2006, no pet.).

It is uncontested that appellants were all Baylor employees
during the relevant time period and that the conduct at issue fell within the
scope of that employment.  The key issues in dispute are (1) whether
Baylor should be considered a governmental unit, and (2) if so, whether
Villarreal could have brought suit against Baylor under the TTCA.  In its
order, the trial court specifically found against appellants on both issues.

 

We begin by addressing the question of whether Baylor
should be considered a governmental unit in this context.  Appellants
contend that under the TTCA, all entities classified as Astate agencies@ also constitute Agovernmental units,@ citing Civil
Practice and Remedies Code ' 101.001(3)(A)B(D).[2] 
They further contend that Baylor is a Asupported medical school@ under Texas
Health and Safety Code ' 312.002(6), and that when operating as a
supported medical school, Baylor is a state agency and, thus, a governmental
unit.  Tex.
Health & Safety Code ' 312.002(6).[3] 
Appellants presented evidence in support of their motion to dismiss showing
that Baylor meets the criteria for being a supported medical school; neither
Villarreal nor the trial court has suggested otherwise.  Accordingly, we
shall narrow our analysis to the question of whether a private institution such
as BaylorCacting in its capacity
as a supported medical schoolCshould be considered a
state agency and thus a governmental institution for purposes of applying
section 101.106(f).

Appellants contend that section 312.007(a) of the Health
and Safety Code Aexpressly and unequivocally@ provides that a
supported medical school is a state agency.  Section 312.007 states in its
entirety:

(a) A medical and dental unit, supported medical or
dental school, or coordinating entity is a state agency, and a director,
trustee, officer, intern, resident, fellow, faculty member, or other associated
health care professional or employee of a medical and dental unit, supported
medical or dental school, or coordinating entity is an employee of a state
agency for purposes of Chapter 104, Civil Practice and Remedies Code, and for
purposes of determining the liability, if any, of the person for the person=s acts or omissions while engaged
in the coordinated or cooperative activities of the unit, school, or entity.

 

(b) A judgment in
an action or settlement of a claim against a medical and dental unit, supported
medical or dental school, or coordinating entity under Chapter 101, Civil
Practice and Remedies Code, bars any action involving the same subject matter
by the claimant against a director, trustee, officer, intern, resident, fellow,
faculty member, or other associated health care professional or employee of the
unit, school, or entity whose act or omission gave rise to the claim as if the
person were an employee of a governmental unit against which the claim was
asserted as provided under Section 101.106, Civil Practice and Remedies Code.

Tex.
Health & Safety Code ' 312.007.

Subsection (a), upon which our analysis must focus, can be
broken down into four constituent clauses as follows:

 

(1)  AA . . . supported medical . . .
school . . . is a state agency,@

 

(2)  Aa[n] employee of a . . . supported medical . . . school . . . is an
employee of a state agency,@[4]

 

(3)  Afor purposes of Chapter 104, Civil Practice and Remedies Code,@ and

 

(4) Afor purposes of determining
the liability, if any, of the person for the person=s acts or
omissions while engaged in the coordinated or cooperative activities of the . .
. school . . . .@

Villarreal
and the trial court interpret section 312.007(a) such that clauses 3 and 4
modify both clause 1 and clause 2.  In other words, they conclude that a
supported medical school is a state agency only for purposes of Chapter 104[5]
and for purposes of determining the liability of an employee.[6] 
In contrast, appellants would have us read clause 1 as an independent clause
unaffected by the remainder of the sentence, with clauses 3 and 4 modifying
only clause 2 and not clause 1.  Appellants base their argument primarily
on the placement of the comma after the term Astate agency@ in clause 1.

B.  Standards of Review

 

We review a trial court=s interpretation
of an applicable statute under a de novo standard.  See Johnson v. City
of Fort Worth, 774 S.W.2d
653, 655‑56 (Tex.
1989).  In construing a statute, our objective is to determine and
give effect to the legislature=s intent.  See Nat=l Liab. & Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527 (Tex. 2000).  If
possible, we must ascertain that intent from the statutory language itself and
not look to extraneous matters for guidance.  Id.  If the meaning of the
statutory language is unambiguous, we will adopt the interpretation supported
by the plain meaning of the provision=s words.  St.
Luke=s Episcopal Hosp. v. Agbor, 952 S.W.2d 503,
505 (Tex.
1997).  We must not engage in forced or strained construction; instead, we
yield to the plain sense of the words the legislature chose.  See id.

C.  Analysis[7]

 

According to appellants, pursuant to the rules of grammar,
the placement of the comma after Astate agency@ in section
312.007(a) cuts off everything before the comma from the rest of the sentence,
creating two exclusive, independent clauses:  one containing just clause 1
identified above, and the other containing clauses 2, 3, and 4.[8] 
Appellants, however, do not recite any of the supposed rules of grammar on
which they rely.  AAn independent
clause expresses a complete thought and can stand alone as a sentence.@  The Gregg Reference Manual 553.
(9th ed. 2001).  However, the mere fact that a
clause is an independent clause does not mean that it cannot be modified by
other elements within the sentence.  See, e.g., id. at 25
(identifying at least one situation in which a single phrase can modify two
separate independent clauses in the same sentence).  Additionally, it
appears that the comma in question was used for purposes of clarity.  See
id. at 38 (stating that a comma can be used for
clarity and to prevent misreading).  Subsection (a) is comprised of a
single compound sentence.  Although the comma after Astate agency@ provides a break
after the first independent clause and the start of the second independent
clause, it also keeps the first clause from running into the list which begins
clause 2 (Aa director, trustee, officer . . . @).  Without
the comma, a reader might initially be confused as to where the first clause
ends and the list at the start of the second clause begins.  The comma in
question does not by itself establish that clauses 3 and 4 (technically Aadverbial phrases,@ see id. at 557) do not modify both
independent clauses (i.e., clauses 1 and 2).  Accordingly, we find
appellants= grammatical argument unpersuasive.[9]

 

Looking at subsection (a) in its entirety and in the
context in which it occurs, it seems unlikely and illogical for the legislature
to have intended by the insertion of clause 1 in subsection (a) to make
supported medical schools into state agencies for all purposes.  See
generally In re J.A.J., 225 S.W.3d 621, 626 n.7 (Tex. App.CHouston
[14th Dist.] 2006) (choosing the statutory interpretation that appeared most
logical given the statutory language and related case law), rev=d in part on other
grounds, 243 S.W.3d 611 (Tex.
2007).  Section 312.007 is labeled AIndividual Liability,@ and while the
heading of a statutory provision is not determinative of its content, the
entirety of section 312.007 is devoted to providing limitations on the
potential liability of persons working for certain medical entities.  See
generally In re Shaw, 204 S.W.3d 9, 17 (Tex. App.CTexarkana
2006, pet. refused) (noting that a statute=s title must give
fair notice of the statute=s contents but ultimately the language of
the statute controls its meaning).  Dropping in a provision that supported
medical schools (and certain other medical entities) are state agencies for all
purposesCa mandate that could
have far reaching effectsCin the middle of this
section otherwise dealing only with individual liability makes no sense. 
Further still, had the legislature intended to say in section 312.007 that such
entities were state agencies for all purposes, it would have been more logical
to put such an important pronouncement in its own separately lettered
subsection, or at a minimum, to put it in a separate sentence within subsection
(a), most helpfully with an indication that the pronouncement was for all
purposes and not just for the purposes enunciated in section 312.007. 
Coherence requires that clauses 3 and 4 modify not only clause 2 but clause 1
as well.

Appellants further argue that reading clauses 3 and 4 as
modifying clause 1 would render subsection (a) senseless.  To make this
point, they offer a merged version of clause 1 with clauses 3 and 4, as
follows:  A[A] supported
medical . . . school . . . is a state agency for purposes of Chapter 104 . . .
and for purposes of determining the liability, if any, of the person for the
person=s acts or omissions
while engaged in the coordinated or cooperative activities of the . . . school
. . . .@  This
interpretation is fallacious.  Eliminating clause 2 from subsection (a)
would render the subsection unclear, in large part because clause 4 refers back
to 2 (for a definition of Aperson@) and thus without
clause 2, clause 4 makes no sense regardless of whether it modifies clause 1 or
not.  We cannot ignore that the subsection does in fact contain clause
2.  Reading all four clauses together makes it clear that a supported
medical school is a state agency and an employee of a supported medical school
is an employee of a state agency for purposes of Chapter 104 and for purposes
of determining the employee=s liability under certain
circumstances.  The subsection neither says nor stands for more than that.

 

In their reply brief, appellants additionally argue that
the legislative history of Chapter 312 evinces an intent
to equalize the level of potential liability between private medical
institutions and governmental institutions when those institutions engage in
cooperative or coordinated health care services, citing House Committee on
Higher Education, Bill Analyses, Tex. S.B. 1062, 71st Leg., R.S. (1987).[10] 
The cited history does support the contention that the legislature desired to
equalize potential liability between cooperating institutions; however, viewed
more specifically, the cited history supports rather than refutes the
interpretation of section 312.007(a) as providing that a supported medical
school is a state agency only for purposes of Chapter 104 and for purposes of
determining the liability of an employee.  In other words, the cited
history supports the conclusion that clauses 3 and 4 of subsection (a) modify
both clause 1 and clause 2.

 

To begin with, the two bill analyses do not state at any
point that supported medical schools should be considered state agencies for
all purposes rather than just for the purposes stated in section
312.007(a).  More importantly, in offering a synopsis of the specific
language at issue here, one of the bill analyses states that the employees of
the private institutions Ashall be deemed
employees of a state agency and the unit, school, or entity shall be deemed a state
agency for purposes of the Civil Practice and Remedies Code, and for purposes
of determining liability while engaged in coordinated or cooperative
activities.@  The other bill analysis states similarly that Athe unit, school, or
entity shall be deemed a state agency for purposes of Chapter 104, Civil
Practice and Remedies Code, and for purposes of determining liability while
engaged in coordinated or cooperative activities.@  Both bill
analyses reverse the order of clauses 1 and 2 from how they are presented in
the final statute, thus confirming that both clause 1 and clause 2 are intended
to be modified by clauses 3 and 4 regardless of their order in the
sentence.  In short, the legislative history cited by appellants actually
supports the interpretation proffered by Villarreal and adopted by the trial
court and not that proposed by appellants.  Based on the foregoing, we
find that appellants= argument that section 312.007(a) makes
Baylor a state agency for all purposesCand
thus a governmental unit under Civil Practice & Remedies Code ' 101.106(f)Cis without merit.

Lastly, in one paragraph of their reply brief, appellants suggest that even if
section 312.007(a) is interpreted to mean that supported medical schools are
state agencies only for the limited purposes of chapter 104 and of determining
liability, Baylor should be deemed a state agency in this case because this
lawsuit seeks to determine appellants= liability.[11] 
However, by moving for dismissal under section 101.106(f), appellants asserted immunity
from suit not immunity from liability.  See Phillips,
187 S.W.3d at 672-73 (describing section 101.106(f) as authorizing immunity
from suit); see generally Baylor Coll. of Med. v. Hernandez, 208 S.W.3d
4, 9-10 (Tex. App.CHouston [14th Dist.]
2006, pet. denied) (distinguishing between statutes granting immunity from suit
and statutes granting immunity from liability).

In their reply brief, appellants offer no argument as to
how the reference to determining liability in section 312.007(a) could
encompass immunity from suit under section 101.106(f).  Indeed, immunity
from suit precludes a determination of liability; thus, the statement in
section 312.007(a) that supported medical schools are state agencies for purposes
of determining liability would not appear to apply to section 101.106(f), which
provides a method for avoiding altogether a determination of liability.

 

In their
motion for rehearing, appellants argue that the phrase Adetermining liability@ in section 312.007(a) encompasses
both determinations of immunity from liability as well as determinations of
immunity from suit.  They assert that the term Aliability@ in this context is broader than the
phrase Aimmunity from liability.@  They further support this
argument by renewed reference to legislative history (discussed above), wherein
the legislature to some degree expressed an intent to level the field of
liability faced by private and public medical entities when cooperating to
provide patient care at public facilities.  One problem with appellants= new interpretation, reading Adetermining liability@ so as to encompass immunity from
suit, is that it would render paragraph (b) of section 312.007
meaningless.  Paragraph (b) bars any action against an employee of a
supported medical school when there has already been a judgment or settlement
entered in a claim against the medical school based on the same subject matter,
Aas if the person were an employee of a governmental unit . . . as provided
under Section 101.106.@ 
See
generally Tex. Dept. of Agric. v. Calderon, 221 S.W.3d 918, 922 (Tex. App.CCorpus Christi 2007, no pet.) (holding that Abars any suit@ language in a
statute provides an unequivocal grant of immunity from suit).  If the legislature intended in
paragraph (a) to make employees of supported medical schools immune from suit
just like state employees, as appellants now argue, there would have been no
reason for the legislature to then grant one specific type of governmental
employee immunity from suit in paragraph (b).  When possible, we must not
interpret one portion of a statute so as to render another portion of the
statute meaningless.  See Tex. Gov=t Code ' 311.021; Tex. Mun. Power Agency v. Public Util. Comm=n of Tex., 253 S.W.3d 184, 199 (Tex. 2008); see also Bexar Metro. Water Dist. v. City of San Antonio, 228 S.W.3d 887, 898 (Tex. App.CAustin
2007, no pet.) (citing section
311.021 in interpreting a statute so as not to be redundant). 
Consequently, we reject appellants= motion for rehearing
argument.

The trial court did not err in denying appellants= motion to dismiss
based on section 101.106(f).  Because of our resolution of this issue, we
need not address the subsidiary issue of whether Villarreal could have sued
Baylor.  Accordingly, we overrule appellants= two issues in
cause number 14-07-00736-CV.  We also overrule appellant=s motion for
rehearing.

III.  Common Law Official Immunity

In cause number 14-07-00926-CV, appellants Saade, Belfort, and Mangal[12]
challenge the trial court=s denial of their motion for summary
judgment based on common law official immunity.[13] 
In their first issue, appellants contend that our prior opinion in a related case
is not dispositive of the present appeal under the Alaw of the case@ doctrine. 
In their second issue, appellants contend that the trial court erred in
determining that they failed to establish their right to common law official
immunity.  In their third issue, appellants urge us to reconsider the Kassen rule insofar as the Texas Supreme Court has
unfairly placed an additional and unwarranted burden on medical care providers
in government service.  Kassen v. Hatley, 887 S.W.2d 4, 8 (Tex. 1994).

A.  Standards of Review

Official immunity constitutes an affirmative defense; thus,
to be entitled to summary judgment, appellants had to conclusively establish
each element.  Kassen, 887
S.W.2d at 8.  To meet this burden, appellants must demonstrate that
there is no genuine issue of material fact and that they are entitled to
judgment as a matter of law.  Id.
at 8 n.2.  We review a trial court=s denial of
summary judgment de novo.  Joe v. Two Thirty Nine Joint Venture, 145
S.W.3d 150, 156 (Tex.
2004).  In determining whether an issue of material fact
exists, we take as true all evidence favorable to the nonmovant
and indulge all reasonable inferences in the nonmovant=s favor.  Kassen, 887 S.W.2d at 8 n.2.

 

To establish a defense of official immunity, public employees
must prove the following elements:  (1) the performance of a discretionary
function, (2) in good faith, and (3) within the scope of the employee=s authority. 
Kassen, 887 S.W.2d at 9. 
Government‑employed medical personnel must further establish that they
are being sued for the exercise of Agovernmental@ rather than
strictly Amedical@ discretion. 
Id. at 10-11; Mussemann v.
Villarreal, 178 S.W.3d 319, 323 (Tex. App.CHouston
[14th Dist.] 2005, pet. denied).  AGovernmental discretion@ in this context
generally refers to actions taken in an administrative or policy‑making
capacity and excludes strictly medical decision-making.  Kassen,
887 S.W.2d at 11 & n.7; Mussemann, 178
S.W.3d at 323-24.  Both Kassen and
Mussemann suggest that the actual
treatment of individual patients will generally require the exercise of only
medical as opposed to governmental discretion and, thus, will not occasion
immunity.  Kassen, 887 S.W.2d at 10-11 & n.7; Mussemann,
178 S.W.3d at 324.

In discussing the distinction between governmental
discretion and medical discretion, the Kassen
court indicated that government‑employed medical personnel exercise
governmental discretion when they:  (1) exercise policy‑making or
administrative responsibilities not shared by private‑sector providers,
or (2) decide how to allocate a scarce pool of state resources among possible
recipients.  887 S.W.2d at 10.  The court
further stated that if governmental factors and concerns colored the discretion
of government‑employed medical personnel, policy considerations may call
for immunity, even though these personnel have duties and responsibilities that
coincide with private‑sector providers.  Id. at 12.  Thus, the issue does not turn specifically on
whether the discretion at issue was Auniquely governmental@; instead, we must
examine the facts of the particular case in relation to the underlying policies
promoted by official immunity.  Id.[14] 
While the Kassen court declined to draw a
bright line for determining when discretionary acts are governmental rather
than medical in nature, it did recommend consideration of the following
factors:

 

1. the nature and
importance of the function that the employee is performing,

2. the extent to which
passing judgment on the exercise of discretion by the employee will amount to
passing judgment on the conduct of a coordinate branch of government or an
agency thereof,

3. the extent to which the
imposition of liability would impair the employee=s free exercise of discretion,

4. the extent to which
financial responsibility will fall on the employee,

5. the likelihood that harm
will result to the public if the employee acts,

6. the nature and
seriousness of the type of harm that may be produced, and

7. the availability to the injured party of other remedies and
forms of relief.  

Id. at 12 n.8 (citing Restatement (Second) of Torts '
895D cmt. f (1977)).[15]

B.  Mussemann v. Villarreal

 

The parties initially dispute to what extent our opinion in
Mussemann, which involved the same plaintiff
and the same alleged harm, controls our decision in the present appeal. 
Specifically, in their first issue, appellants attempt to differentiate their situations
from those confronted by the doctors in Mussemann
by pointing out that they (appellants) were only supervisors and did not
actually perform any procedures on Villarreal.  This distinction is not
strictly accurate.  Mussemann involved
two doctors, Mussemann and Hersch,
who were being sued, at least in part, because of their supervision of other
defendants.  In regards to these allegations, we stated that Asupervising the medical
decision-making of less-experienced doctors, along with determining when to
consult more-experienced physicians, are the exercise of medical discretion.@  Mussemann, 178 S.W.3d at 325.  Appellants
additionally have attempted to distance themselves from Mussemann
by providing more evidence regarding the nature of practice at Ben Taub Hospital. 
We agree that because (1) the order before us is the denial of a summary
judgment, (2) the defendants are different than those in Mussemann,
and (3) additional evidence has been presented, Mussemann
does not control the current appeal as Alaw of the case@; Mussemann does, however, guide our analysis.  See
generally Loram Maint.
of Way, Inc. v. Ianni,
210 S.W.3d 593, 596 (Tex. 2006) (discussing Alaw of the case@ doctrine);
Briscoe v. Goodmark Corp., 102 S.W.3d 714, 716 (Tex. 2003) (same).[16]

C.  Governmental Versus Strictly Medical Discretion

In their second issue, appellants assign error to the trial
court=s holding that
they failed to establish as a matter of law their entitlement to common law
official immunity.  Appellants maintain that they established exercise of
governmental discretion by virtue of their supervision of government healthcare
providers in a government hospital.  More specifically, appellants argue
that given the responsibilities and constraints associated with working at Ben Taub, their supervision was an exercise of governmental
discretion because it was significantly colored by governmental factors and
constituted an administrative duty involving the allocation of state
resources.  They emphasize that physicians in the private sector are not
required to perform these functions under the exact conditions that exist at
Ben Taub, particularly the large patient population
and the ratio of supervising doctors to residents.  They further make
arguments based on the seven factors identified in Kassen
and emphasize the dearth of evidence regarding the precise nature of Mangal=s supervision of delivery.

1.  Practice and Conditions at Ben Taub

 

It is clear from the pleadings in this lawsuit and the
proceedings thus far that Villarreal is suing appellants for medical
decision-making and the supervision of medical decision-making in relation to
her pregnancy and the delivery of Juan Pablo Elizondo. 
Appellants recognize that the mere fact of a government hospital environment
does not necessarily render their supervision governmental in nature when
similar supervision in the private sector would clearly not be
governmental.  See Kassen,
887 S.W.2d at 11 (rejecting blanket immunity for government medical personnel). 
Instead, appellants argue that governmental factors colored their medical
decision-making and supervision such that policy concerns warrant application
of official immunity.[17]

 

Appellants presented evidence that Ben Taub
supervising physicians, such as themselves, must supervise more healthcare
providers treating more patients than do supervising physicians in private
sector obstetric units.[18] 
They further presented evidence that the healthcare providers under their
supervision tended to have less experience and greater responsibilities than in
the typical private sector situation and that patients
at public facilities often have more risk factors than do patients in private
facilities.  In Mussemann, we pointed out
that the difficulties
appellants highlight at Ben Taub (the alleged Agovernmental factors@ coloring their decision-making) are likely
present in most or all public hospitals; thus, to hold that the existence of
these factors conclusively establishes a right to official immunity would
render the Kassen analysis practically
meaningless.  Mussemann, 178 S.W.3d at 326.  While public hospital
supervision may be more difficult, this characteristic alone does not render
conduct governmental when it otherwise would not be.  It is the nature
of the decision being made, not its complexity, that renders it
governmental.  Indeed, strictly medical decisions may often be more
difficult and complex than decisions involving governmental discretion.  See
generally Kassen, 887 S.W.2d at 11 (Agovernment-employed medical
personnel exercise considerable judgment and deliberation in performing their
medical duties@).  Ultimately, in the present case, discretion
was exercised in the treatment of an individual patient.  The courts in Kassen and Mussemann
both emphasized that discretion exercised in the treatment of individual
patients is generally medical in nature, not governmental.  See Kassen, 887 S.W.2d at 10-11
& n.7; Mussemann, 178 S.W.3d at 324.

Governmental discretion, on the other hand, typically
occurs when government physicians:  (1) exercise policy‑making or
administrative responsibilities not shared by private‑sector providers,
or (2) decide how to allocate a scarce pool of state resources among possible
recipients.  Kassen, 887
S.W.2d at 10.  Appellants additionally argue that they had
administrative duties and were allocating scarce government resources, citing
as an example only the allocation of their own time.  The problem with
this assertion is that it is too broad:  every physician in a
government hospital (and even in private settings) is required to allocate his
or her time among patients.  Thus, if a physician=s allocation of his or her own time were sufficient for
official immunity, then every government physician would be entitled to
immunity without the need for further analysis: Kassen
would again be rendered meaningless.[19] 
Under both Kassen and Mussemann,
we must draw a distinction between decisions made in the treatment of
individual patients (such as whether a supervisor should become more involved
in a particular patient=s care under the circumstances) and
decisions that make policy or determine how to allocate resources.  Kassen,
887 S.W.2d at 10-11 & n.7; Mussemann, 178
S.W.3d at 323-24.  Appellants= decisions
regarding the level of their involvement with Villarreal were specific
treatment decisions for an individual patient, not a generalized policy-making
or allocation decision; thus, under Kassen and
Mussemann, these decisions were purely medical
in nature and not governmental.[20]

 

2.  The Seven Kassen Factors

 
        We now turn to the seven factors
identified in Kassen.  Appellants tacitly
acknowledge that three of the factors do not support finding official immunity
in this case (as numbered in Kassen): 
(4) the extent to which financial responsibility will fall on the employee, (5)
the likelihood that harm will result to the public if the employee acts, and
(6) the nature and seriousness of the type of harm that may be produced. 
Turning to the first listed factorCthe
nature and importance of the function that the employee is performingCappellants
emphasize the important role that supervising physicians play at Ben Taub.  While we acknowledge its importance, the role
played by the physicians here appears to be a medical one:  supervising the
care of individuals.  Kassen, 887 S.W.2d at 10-11 & n.7; Mussemann,
178 S.W.3d at 323-24.  Even though supervision at Ben Taub may be a difficult and important task, appellants have
not shown that it typically involves governmental rather than medical discretion.

In discussing the second factorCthe
extent to which passing judgment on the exercise of discretion will amount to
passing judgment on the conduct of a coordinate branch of government or an
agency thereofCappellants argue that
examining their conduct will require passing judgment on the very model of care
employed at Ben Taub.  We do not agree. 
Villarreal=s claims attack appellant=s individual
medical decision-making regarding a single patient, not the overall scheme of
care at Ben Taub.

 

Addressing the third factorCthe
extent to which the imposition of liability would impair the employee=s free exercise of
discretionCappellants argue that
imposing liability would require Ben Taub supervising
physicians to personally observe or perform all procedures in the future. 
We disagree.  Villarreal=s complaints are principally that the
supervising physicians made negligent medical decisions and failed to properly
supervise, not that they should have performed every procedure themselves.

Lastly, concerning factor sevenCthe
availability to the injured party of other remedies and forms of reliefCappellants point out that Villarreal could
recover for her injuries from Baylor as well as from the residents who
performed the procedures in question.  While the argument may be correct,
this single factor does not outweigh the other six in the analysis. 
Examined together, the seven factors identified in Kassen
support our conclusion that appellants have not established their entitlement
to official immunity.

3.  Dr. Mangal

 

Subsidiary to their primary argument that they established
official immunity as a matter of law, appellants point out the alleged dearth
of proof that Mangal actively supervised any aspect
of Villarreal=s care.  Appellants claim to have conclusively
proved that Mangal was not consulted regarding
Villarreal=s care and did not personally examine her.  In
support, they offer only Mangal=s affidavit
attached to the motion for summary judgment.  In this affidavit, Mangal states that he was the Aon-call supervising
physician@ in Obstetrics and Gynecology at Ben Taub on the night Elizondo was
born.  Mangal states that he was physically
present in the Labor and Delivery Unit that night and was available to the
residents for consultation.  He indicates that he generally becomes
involved in a particular patient=s care only if
consulted.  He does not Arecall whether [he] was
consulted regarding Ms. Villarreal . . . whether [he] ever became aware of her
presence on the unit before her delivery [or] whether [he] was physically
present at Ms. Villarreal=s bedside or in the operating room during
her cesarean section.@  This affidavit establishes only
that (1) Mangal was present as a supervisor in the
unit when Villarreal gave birth, and (2) he does not remember whether or not he
was directly involved in Villarreal=s care. 
Moreover, Villarreal introduced evidence that Mangal
signed Villarreal=s chart as having Asupervised@ her delivery,
although Mangal stated that he often signed charts in
this manner simply to show that he was on call and available for
consultation.  Appellants= argument regarding Mangal
appears aimed more at demonstrating that he did not exercise any discretion at
all, not that he exercised governmental discretion.  In order to be
entitled to summary judgment on official immunity, appellants (including Mangal) were required to show that they exercised
governmental discretion.  See Kassen, 887 S.W.2d at 10-11; Mussemann,
178 S.W.3d at 323.  The evidence concerning whether Mangal
actually supervised Villarreal=s care goes to the issue of liability, not
the exercise of governmental discretion.  Based on the foregoing analysis,
we find that appellants failed to conclusively demonstrate their entitlement to
summary judgment based on official immunity.  Accordingly, we overrule
appellants= second issue.

D.  Kassen Revisited

In their third issue, appellants argue that the Texas
Supreme Court acted unfairly in Kassen by
requiring government physicians to meet an additional burden, i.e., proving
that their conduct involved governmental rather than medical discretion, to be
entitled to common law official immunity.  As we explained in Mussemann, the supreme court
has considered and rejected appellants= arguments, and as
an intermediate appellate court, we may neither re-evaluate the supreme court=s pronouncements
nor refuse to apply them where applicable.  178 S.W.3d at 329 (citing In
re K.M.S., 91 S.W.3d 331 (Tex.
2002)).  Accordingly, we overrule appellants= third issue in
cause number 14-07-00926-CV.  Because we find no merit in any of
appellants= arguments concerning the propriety of the trial court=s denial of the
motion for summary judgment, we affirm the trial court=s order.

IV.  Disposition

In cause number 14-07-00736-CV, we affirm the trial court=s denial of
appellants= motion to dismiss.  In cause number
14-07-00926-CV, we affirm the trial court=s denial of the
motion for summary judgment.

         


/s/     
Adele Hedges

Chief Justice

Panel consists of
Chief Justice Hedges and Justices Guzman and Brown. (Guzman, J. Concurring).














[1]  As will be explained in greater detail below,
in Mussemann, we held that the trial court
properly denied the doctors= motion for
summary judgment because the doctors failed to conclusively establish that they
were entitled to common law official immunity.  178
S.W.3d at 320, 329-30.  The opinion and disposition in the prior
appeal informs but does not control certain of our holdings in the present
appeal.





[2]  Section 101.001(3) defines Agovernmental
unit@ for purposes of the TTCA to mean:

 

(A) this state and all the several agencies of
government that collectively constitute the government of this state, including
other agencies bearing different designations, and all departments, bureaus,
boards, commissions, offices, agencies, councils, and courts;

 

(B) a political subdivision of this state, including
any city, county, school district, junior college district, levee improvement
district, drainage district, irrigation district, water improvement district,
water control and improvement district, water control and preservation
district, freshwater supply district, navigation district, conservation and
reclamation district, soil conservation district, communication district,
public health district, and river authority;

 

(C) an emergency service
organization;  and

 

(D) any other institution,
agency, or organ of government the status and authority of which are derived
from the Constitution of Texas or from laws passed by the legislature under the
constitution.

 

Tex. Civ. Prac. & Rem. Code ' 101.001(3).





[3]  Section 312.002(6) defines Asupported
medical school@ as Aa medical school . . .
organized as a nonprofit corporation that is under contract with the Texas
Higher Education Coordinating Board to provide educational services under
Subchapter D, Chapter 61, Education Code.@  Tex. Health
& Safety Code ' 312.002(6).





[4]  For simplicity purposes, we use the first Aemployee@ in
this excerpted phrase in place of the categorical list which includes:  Adirector,
trustee, officer, intern, resident, fellow, faculty member, or other associated
health care professional or employee.@





[5]  Chapter 104 of the Civil Practice and Remedies
Code governs state indemnification of public servants for conduct in the scope
of their office, employment, or contractual obligation with the state.  See
Tex. Civ. Prac. & Rem. Code ' 104.001-.009.





[6]  In Klein v. Hernandez, the First Court
of Appeals also concluded that clauses 3 and 4 modify both clause 1 and clause
2; however, in coming to that conclusion, the court did not specifically
address the arguments appellants make in the present case.  260 S.W.3d 1, 7-8 (Tex. App.CHouston [1st Dist.]
2008, pet. filed).  Accordingly, we will make no further reference
to Klein in our analysis of subsection (a).





[7]  We previously denied without opinion Villarreal=s motion to dismiss this interlocutory appeal for want
of jurisdiction, a decision compelled by our prior precedent.  See
Young v. Villegas, 231 S.W.3d 1, 7-8 (Tex. App.CHouston [14th Dist.]
2007, pet. denied) (holding that Civil Practice and Remedies Code section
51.014(a) authorizes an interlocutory appeal based on Health and Safety Code
section 312.007(a)); Phillips, 187 S.W.3d at 673-75 (holding that
section 51.014(a) authorizes an interlocutory appeal based on Civil Practice
and Remedies Code section 101.106(f) even when the underlying motion sought
dismissal instead of summary judgment).  We note, however, that this area
of jurisdictional jurisprudence is highly unsettled.  See,
e.g., Klein, 260 S.W.3d at 9-10 (declining to follow Young); Hudak v. Campbell, 232 S.W.3d 930, 931 (Tex. App.CDallas
2007, no pet.) (declining to follow Phillips);
see also Tex.
A&M Univ. Sys. v. Koseoglu, 233 S.W.3d
835,842-43 (Tex.
2007) (attempting to clarify interpretation of section 51.014(a)(5)); Klein, 260 S.W.3d at 11-17 (Taft, J.,
concurring) (suggesting that the Koseoglu
opinion is self-contradictory and that the Klein majority=s interpretation of section 312.007(a) is too
narrow).  We further note with encouragement that the Texas Supreme Court
has requested a response to the petition for review in Klein.





[8]  Under appellants= construction, the first independent clause would read:  AA . . . supported medical . . . school . . . is a
state agency.@  The second independent clause would read: A[An] employee of a . . . supported medical . . .
school . . . is an employee of a state agency for purposes of Chapter 104,
Civil Practice and Remedies Code, and for purposes of determining the
liability, if any, of the person for the person=s acts or omissions while engaged in the coordinated or cooperative
activities of the . . . school . . . .@





[9]  Although neither cited to nor relied upon by
appellants, we are also mindful of the Alast
antecedent doctrine,@
which advises that generally, a relative or qualifying clause applies only to
the immediately preceding words or clause.  E.g.,
82 C.J.S. Statutes '
333 (1999).  This doctrine, however, is not a controlling canon of
statutory construction but is merely an aid to construction.  See City
of Corsicana v. Willmann,
147 Tex. 377,
379, 216 S.W.2d 175, 176 (1949); 82 C.J.S. Statutes ' 333.  It does not apply if anything in the
language, context, purpose, or subject matter of the statute suggests it should
not.  See City of Corsicana,
216 S.W.2d at 176; 82 C.J.S. Statutes ' 333.  As fully explained in the
text, the language, purpose, context, subject matter, and legislative history
of section 312.007(a) all indicate that the legislature intended for clauses 3
and 4 to apply to both clause 1 and clause 2 and not just to clause 2;
consequently, the last antecedent doctrine does not govern interpretation of
this statute.





[10]  Appellants actually cite two separate bill
analyses by the same committee; however, the AGreen
Book@ rules of citation do not
provide a method for distinguishing between the two documents.  See Texas Rules of Form 14.3, at 66 (Texas Law Review Ass=n et al. eds., 11th ed. 2006).  One bill analysis
refers to committee action on May 7, 1987; the other does not; neither is
otherwise dated.





[11]  It is unclear whether appellants made this
argument in the trial court.  However, because it may have been
encompassed by appellants= generalized trial arguments, we will address it here
in the interest of justice and completion.  See generally Wohlfahrt v. Holloway, 172 S.W.3d 630, 639-40 (Tex. App.CHouston
[14th Dist.] 2005, pet. denied) (A[A] party=s argument on appeal must comport with its argument in
the trial court.@).





[12]  By use of the term Aappellants@ in
this portion of the opinion, we refer to Saade, Belfort,
and Mangal.





[13]  We previously held in a related case that we
have jurisdiction over such an interlocutory appeal under section 51.014(a)(5) of the Civil Practice and Remedies Code.  Mussemann
v. Villarreal, 178 S.W.3d 319, 321 n.1 (Tex. App.CHouston [14th Dist.]
2005, pet. denied).





[14]  In their arguments, appellants suggest that the
Kassen court authorized official immunity for
either an exercise of governmental discretion or for when an exercise of
medical discretion is colored by governmental factors, citing Kassen, 887 S.W.2d at 12.  However, as we explained
in Mussemann, the Kassen
language on which appellants rely for this assertion merely helps explain when
discretion is governmental; it does not create a separate criterion independent
from governmental discretion.  Mussemann,
178 S.W.3d at 328-29.





[15]  It is unclear exactly how or when the Kassen court intended for the factors it identified
to be used.  Beyond listing them, the court neither specifically analyzed
them nor obviously employed them in Kassen
itself.  887
S.W.2d at 12 n.8.  We did likewise in Mussemann. 
178 S.W.3d at 324.





[16]  Appellants=
first issue addresses the framework of our analysis and does not urge a particular
outcome.  While we generally agree with the point madeCthat Mussemann does not control as law of the caseCthe
issue does not necessarily lead to a ruling favoring appellants. 
Accordingly, we decline to formally rule.





[17]  As explained in footnote 14 above, the Acolored
by governmental factors@ analysis is part of, not independent from, the
governmental discretion/purely medical discretion analysis.  Supra n.14;
see also Mussemann, 178 S.W.3d at 328-29.





[18]  While appellants generally discuss the
constraints on their time as supervisors at BenTaub,
they stop short of asserting that they were unable to spend time on Villarreal=s care because of these constraints.





[19]  Villarreal=s
allegations are not limited to complaints that appellants did not devote enough
time to her care; she also challenges specific treatment decisions. 
Appellants do not argue that these specific treatment decisions were
governmental in nature; it would be difficult to argue that the decision to
perform a procedure (e.g., a BPP or amniocentesis) was the result of the need
to allocate scarce resources.





[20]  In Kassen, the
physician-defendants argued that the need to allocate scarce state resources
influenced their decision to not admit a patient to a government
facility.  887 S.W.2d at 12.  The supreme court refused to rule on the merits of this argument
because in the trial court, the defendants argued only that admission was not
proper based on therapeutic considerations.  Id.  It is therefore unclear in Kassen whether a decision to admit a patient could
be considered governmental in nature.  Nonetheless, the decision to admit
is typically a more generalized, policy-oriented determination than are
specific treatment decisions once a patient has been admitted to a facility.